836 F.2d 173
 56 USLW 2405, 1987-2 Trade Cases 67,814
 COMMONWEALTH OF PENNSYLVANIA, ex rel. LeRoy S. ZIMMERMAN,
Attorney General of Pennsylvania, Appellant,
v.
PEPSICO, INC., Allegheny Pepsi-Cola Bottling Company, Inc.,
and Confair Bottling Company, Inc.
 No. 87-5351.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 17, 1987.
Decided Jan. 4, 1988.
 
 Fred A. Freund (Argued), Richard M. Steuer, Kaye, Scholer, Fierman, Hays and Handler, New York City, Rod J. Pera, Alan R. Boynton, Jr., McNees, Wallace & Nurick, Harrisburg, Pa., Gerard W. Casey, Robert K. Biggart, PepsiCo, Inc., Somers, N.Y., for appellees PepsiCo., Inc. and Allegheny Pepsi-Cola Bottling Co., Inc.
 James B. Kobak, Jr. (Argued), Robert J. Sisk, David W. Wiltenburg, Hughes, Hubbard & Reed, New York City, J. David Smith, McCormick, Rieder, Nichols, Sarno, Bahl & Knecht, Williamsport, Pa., for appellee Confair Bottling Co., Inc.
 Eugene F. Waye (Argued), LeRoy S. Zimmerman, Carl S. Hisiro, Kelly H. Greensmith, Harrisburg, Pa., for appellant.
 Before SEITZ, HUTCHINSON and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question for decision in this antitrust case of first impression under the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. Secs. 3501-3503, is whether the Commonwealth of Pennsylvania, as a parens patriae plaintiff, properly set forth a claim on which relief could be granted in its complaint against PepsiCo, Inc., a soft drink manufacturer, and two Pepsi-Cola bottlers. After affording Pennsylvania an opportunity to amend, the district court analyzed the amended complaint's allegations and, concluding that the plaintiff had failed to mount the hurdles imposed by the Soft Drink Act, dismissed the action for failure to state a claim under Rule 12(b)(6), F.R.Civ.P., 658 F.Supp. 816. Pennsylvania has appealed and we will affirm.
 
 
 2
 The district court had jurisdiction under 28 U.S.C. Sec. 1337. Jurisdiction on appeal is proper based on 28 U.S.C. Sec. 1291.
 
 I.
 
 3
 PepsiCo, Inc. makes soft drink syrup and concentrate, the flavoring ingredients in its trademarked soft drinks. Allegheny and Confair are two Pepsi-Cola bottlers; Allegheny is a wholly-owned subsidiary of PepsiCo. The bottlers buy syrup and concentrate from PepsiCo to produce and sell carbonated soft drinks. Each is licensed by PepsiCo to produce and market its soft drinks within an exclusive geographic territory in Pennsylvania. Both Allegheny and Confair sell soft drinks to distributors, retailers, and other resellers. These resellers are independent operators having no licensing agreements with either PepsiCo or the bottlers.
 
 
 4
 Although resellers generally sell retail, some sell wholesale to other resellers. Under such circumstances, the wholesaling reseller becomes a competitor of the wholesaling bottler. When resellers sell to other resellers outside of their bottler's territory, the practice is known as "transshipping."
 
 
 5
 Pennsylvania alleges that PepsiCo, Allegheny, and Confair have conspired to eliminate horizontal competition between bottlers and resellers by prohibiting sales between resellers. Specifically, Pennsylvania claims that the three defendants have engaged in the following practices: using a coding identification system to trace and monitor soft drink sales; fining bottlers when their product is shipped out of their territory; refusing to deal with resellers who engage in transshipping; refusing to deal with resellers who buy from or sell to other resellers; threatening termination of resellers who engage in such sales; and limiting sales to resellers to the amount the reseller needs solely for its own retail sales, in order to prevent that reseller from wholesaling.
 
 
 6
 Pennsylvania brought a parens patriae action in the district court, alleging that defendants' practices violated section 1 of the Sherman Act, 15 U.S.C. Sec. 1, and seeking an injunction against defendants pursuant to the Clayton Act, 15 U.S.C. Sec. 26. Defendants moved to dismiss for failure to state a claim on which relief could be granted. Rule 12(b)(6), F.R.Civ.P. Pennsylvania filed an amended complaint. defendants again moved to dismiss. On April 28, 1987, the district court granted defendants' motion. Our standard of review of the district court's dismissal is whether, taking the allegations of the complaint as true, and liberally giving the plaintiff the benefit of all inferences that may be drawn therefrom, it appears beyond doubt that the plaintiff can prove no set of facts upon which relief could be granted. Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 273 (3d Cir.1985).
 
 II.
 
 7
 Pennsylvania's case stands or falls on federal statutory authority. Just as the Sherman and Clayton Acts were designed to define antitrust violations, the Soft Drink Act was enacted to remove certain soft drink industry practices from the reach of the antitrust laws:
 
 
 8
 Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agreement ... of provisions ... limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product only for ultimate resale to consumers within a defined geographic area: Provided, That such product is in substantial and effective competition with other products of the same general class in the relevant market or markets.
 
 
 9
 15 U.S.C. Sec. 3501.
 
 
 10
 The Act insures that "[n]othing contained in any antitrust law" shall render enforcement of territorial restraints unlawful, except where it is alleged and proved that competition among soft drink brands--i.e., interbrand competition--is not substantial and effective.
 
 
 11
 The Act also includes a second substantive section that provides:
 
 
 12
 Nothing in this chapter shall be construed to legalize the enforcement of provisions described in section 3501 of this title in trademark licensing contracts or agreements described in that section by means of price fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful.
 
 
 13
 15 U.S.C. Sec. 3502.
 
 
 14
 The genesis of the Act is in the Supreme Court's rulings on vertical restraints, and in the effect of those rulings on standard soft drink industry distribution practices. See Note, The Soft Drink Interbrand Competition Act of 1980: Antitrust Loses its Fizz, 18:1 Harv. J. on Legis. 91 (1981) (hereinafter "Note"). In 1967, the Supreme Court, in the now overruled Schwinn decision, held that, under certain circumstances, manufacturer-imposed territorial restraints are per se illegal under section 1 of the Sherman Act. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 382, 87 S.Ct. 1856, 1867, 18 L.Ed.2d 1249 (1967). The Schwinn decision helped launch a Federal Trade Commission investigation into soft drink industry distribution practices. In 1971, that investigation culminated in the filing of complaints against seven soft drink syrup companies. See Note, supra, at 108.
 
 
 15
 During the pendency of those actions, the Supreme Court overruled the Schwinn decision in Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In Sylvania, the Court held that the law should "return to the rule of reason that governed vertical restrictions prior to Schwinn." Id. at 59, 97 S.Ct. at 2562. In 1978, relying in part on Sylvania, the FTC ruled that certain territorial restrictions existing in the soft drink industry were unlawful. Coca Cola Co., 91 F.T.C. 517 (1978), 642 F.2d 1387 (D.C.Cir.1981) (remanding for dismissal); PepsiCo, Inc., 91 F.T.C. 680 (1978), 642 F.2d 1387 (D.C.Cir.1981) (same). Those decisions were the primary stimuli to the enactment of the Soft Drink Act in 1980. See H.R.Rep. No. 1118, 96th Cong., 2d Sess. 6, reprinted in 1980 U.S. Code Cong. & Admin. News 2373, 2375; Note, supra, at 106.
 
 
 16
 The Soft Drink Act was adopted after Congress conducted an intensive investigation into the soft drink industry. In passing the Act, Congress determined that the exclusive territorial distribution agreements common to the soft drink industry warranted protection because that industry was a prototype of industries in which territorial restraints foster interbrand competition. See H.Rep. No. 1118, reprinted in 1980 U.S. Code Cong. & Admin. News at 2377. Such restraints encourage each bottler to invest and promote in his own territory, and prevent "free riding" by sellers from outside the territory on the bottler's investment and effort. As described in the Senate Report accompanying the Act:
 
 
 17
 Under the trademark licensing system which exists in the soft drink industry, the franchise company produces and sells syrups or flavoring concentrates pursuant to trademark licensing agreements with independent bottlers, participates in advertising and promotional expenditures made in connection with the trademarked products, provides advice and technical assistance on production, quality control, management, and sales problems, and assists in development and test marketing of new products and containers.
 
 
 18
 The bottler, in turn, manufactures, distributes and sells the trademarked products and provides the capital investment necessary for his market. He determines the plant and equipment to be used, the volume of production by size and type of container, the product mix, the wholesale price to be charged, and the manner in which he can maximize his market penetration to secure the widest possible distribution of his products throughout the territory.
 
 
 19
 S.Rep. No. 645, 96th Cong., 2d Sess. 3 (1980).
 
 
 20
 Congress considered what would happen if the long-standing practice of territorial exclusivity was eradicated:
 
 
 21
 If territories are eliminated, wholesale prices for non-returnable packages may fall temporarily for large volume accounts, principally chain stores. However, it is the committee's opinion that it is unlikely that chain stores will pass on these reduced prices to their customers because their past practice has been to maintain a retail price differential between their own private label soft drinks and the franchised brands. Moreover, it is clear that prices in non-chain stores, which account for 55-60 percent of sales, would rise and the cheaper returnable bottles would be more difficult to find.
 
 
 22
 Id. at 9. From these findings, Congress concluded that "the public policy stated in the antitrust laws would be better served by retention of the existing, competitive structure of the soft drink industry under the standards of this bill." Id.
 
 III.
 
 23
 Having examined the statute at issue, we turn to the questions presented. At the outset, we must address a threshold issue. Pennsylvania alleges that the district court erred in concluding that the Soft Drink Act applied to defendants' conduct without first making factual findings on the existence of substantial and effective competition in the relevant market. In the district court, Pennsylvania made no effort to contend by factual allegations or otherwise that the Act did not apply because of an absence of "substantial and effective competition with other products of the same general class in the relevant market or markets." 15 U.S.C. Sec. 3501. The House Report recommending passage of the bill placed this burden squarely on the plaintiff. "If a plaintiff cannot establish that there is an absence of substantial and effective competition within the territory, then the existence and enforcement of such arrangements would not violate the antitrust laws." H.Rep. No. 1118, reprinted in 1980 U.S. Code Cong. & Admin. News at 2373, 2389. Neither the original complaint nor the amended complaint alleged that PepsiCo's products do not face "substantial and effective competition" from other products in the same general class in the relevant market.
 
 
 24
 As Justice Stevens stated in Associated General Contractors of Cal. v. California State Counsel of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983), "[i]t is not proper to assume that [a plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." But there is another reason for putting this issue aside. We have held on numerous occasions that "a trial court should not be reversed on grounds that were never urged or argued in the court below." Caisson Corp. v. Ingersoll-Rand Co., 622 F.2d 672, 680 (3d Cir.1980). Thus, we cannot conclude that the district court erred in applying the Act without making findings on the issue of substantial and effective competition in the relevant market.
 
 IV.
 
 25
 The centerpiece of Pennsylvania's complaint was the allegation that not only did PepsiCo prohibit bottlers from transshipping directly into other territories, but that all three defendants prohibited both bottlers and resellers from aiding and abetting third party transshippers. The plain language of the Act flies in the face of these crucial allegations. The Act explicitly provides for the "enforcement" of agreements limiting extraterritorial sales both "directly or indirectly," and is aimed at combatting both bottlers and third parties who transship. Providing for the limitation of manufacture, distribution, and sale "only for ultimate resale to consumers within a defined geographic area," the language of the Act squarely applies to the entire chain of distribution, from intial manufacture right through the ultimate sale to the consumer. We believe that it is unquestionably permissible for PepsiCo to require a bottler to ensure that the "ultimate" resales of the PepsiCo products it produces will be to consumers within its own territory.
 
 
 26
 We do not find it necessary to go beyond the plain language of the Act to conclude that it applies to transshipments by retailers as well as by bottlers. Yet were it necessary, a resort to the legislative history makes no doubt about the intent of Congress. A number of transshippers testified against the Act, but the record shows that Congress unequivocally rejected their position. See Hearings Before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary of the House of Representatives on H.R. 3567 and H.R. 3573, 96th Cong., 1st and 2d Sess. 196-317 (hereinafter 1980 Hearings ); see also S.Rep. No. 645, 96th Cong., 2d Sess. 10 (1980) (bill precludes "indirect evasions" of license agreements); Exclusive Territorial Allocation Legislation: Hearings Before the Subcomm. on Antitrust and Monopoly of the Comm. on the Judiciary of the United States Senate, 92d Cong., 2d Sess. 356 (1972) ("[I]f we don't have this territorial exclusivity law, [transshipment] is just what is going to happen") (remark by P. Chumbris); id. at 381-83 (remark by C. Bangert); 1980 Hearings, 229-30, 518, 528 (questions posed by Chairman Rodino) ("under this legislation, the retailer would not be able to purchase soft drinks outside the territory"); 126 Cong.Rec. 11358 (1980) (remarks by Sen. Baucus); S.Rep. No. 188, 93d Cong., 1st Sess. 5-6 (1973) (bill makes lawful license provisions which have the effect of precluding indirect evasions of the licensing agreement).V.
 
 
 27
 We now turn to the question of horizontal restraint. Pennsylvania has alleged a conspiracy among PepsiCo, Allegheny, and Confair to eliminate competition for sales of Pepsi-Cola to third parties. The Commonwealth alleged that the defendants were consciously committed to a common scheme of withholding the product from certain resellers so that the resellers could not compete with the bottlers. At argument, Pennsylvania emphasized that it does not rely on theories of vertical restraint and that such allegations in the complaint were set forth only "to show the total scheme of restraints." Its brief makes the same point: "This is a case of first impression, as no court has considered the Soft Drink Act in the context of a horizontal conspiracy among soft drink bottlers and their syrup manufacturer to restrain sales between resellers." Br. for appellant at 8.
 
 
 28
 Section 3502 of the Soft Drink Act exempts from the Act's protection "price-fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful." 15 U.S.C. Sec. 3502. According to appellant, its allegations of horizontal conspiracy and group boycott are sufficient to invoke the exemption provision of section 3502. It thus contends that defendants are constrained from interposing the Soft Drink Act as a total legal defense to the amended complaint.
 
 
 29
 We shall now proceed to examine Pennsylvania's horizontal conspiracy contention, but before we do we make clear that we need not, and do not, decide the extent to which the Act protects vertical restraints. Rather, our inquiry is confined to the single issue of whether, given the protection of the Soft Drink Act afforded the defendants, Pennsylvania's complaint can be fairly read as properly alleging an illegal horizontal conspiracy.[1]
 
 A.
 
 30
 A horizontal conspiracy is governed by section 1 of the Sherman Act, which forbids "any contract, combination ... or conspiracy, in restraint of trade...." 15 U.S.C. Sec. 1. Economic values have played an important role in the development of statutes and case law regulating the market by permitting or prohibiting particular economic conduct. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The dominant value, of course, is the maintenance of competitive commercial and industrial activity in those areas to which the Sherman Act applies. See Contintental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1976). In the present case, the concern is with the maintenance of competition in those areas controlled by the Soft Drink Act. The other value to which the courts have attached importance, as did Congress in adopting the Soft Drink Act, is economic efficiency. See, e.g., Broadcast Music, Inc. v. CBS, 441 U.S. 1, 20, 99 S.Ct. 1551, 1562-63, 60 L.Ed.2d 1 (1979). In a competitive economy, there is a clear goal of efficiency in production, distribution, and resource allocation. We must agree that there is no basic conflict between competition and efficiency.
 
 
 31
 Congress decided that the distribution practices of the soft drink industry merited special protection on the theory that territorial restraints foster the competitive spirit by encouraging each bottler to invest and promote in its own territory. See H.Rep. No. 1118, reprinted in 1980 U.S. Code Cong. & Admin. News at 2373, 2390. Congress also made the calculated judgment that sellers outside a territory could not be intrusive beneficiaries of a bottler's investment and effort. This summarizes, albeit in simplistic form, the basic foundation upon which we must analyze Pennsylvania's allegation of a horizontal conspiracy.
 
 B.
 
 32
 The issued is joined head-on by the parties before us. Pennsylvania asserts that the Soft Drink Act does not apply. It argues that the amended complaint alleges a per se unlawful horizontal conspiracy, and that the Act excludes such per se unlawful restraints from its coverage. PepsiCo, Allegheny, and Confair contend that the conduct alleged in the amended complaint falls within the protection of the Act. The question presented on this appeal comes down to whether the appellant adequately pleaded a per se illegal horizontal conspiracy, which would be excluded from the Act's protection. 15 U.S.C. Sec. 3502. If not, the Act applies, and we must affirm the district court's dismissal of the amended complaint.
 
 
 33
 Before examining the specifics of the complaint, we summarize the ruling case law governing the pleading obligation of a plaintiff in an antitrust case. Our starting point is Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957):
 
 
 34
 [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. The illustrative forms appended to the Rules plainly demonstrate this. Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.
 
 
 35
 Id. at 47-48, 78 S.Ct. at 103 (footnotes omitted).
 
 
 36
 Speaking through Judge Seitz, this court in 1968 admonished that "we should be extremely liberal in construing antitrust complaints." Knuth v. Erie-Crawford Dairy Coop., 395 F.2d 420, 423 (3d Cir.1968), cert. denied, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). But, as Judge Joseph S. Lord III ably pointed out in 1980, "[w]hile antitrust complaints are not subject to especially stringent pleadings, see Knuth, supra, neither are they exempt from the federal rules." Sims v. Mack Truck Corp., 488 F.Supp. 592, 608 (E.D.Pa.1980). Judge Friendly hammered home the same point in Klebanow v. New York Produce Exch., 344 F.2d 294, 299 (2d Cir.1965):
 
 
 37
 A mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently.
 
 
 38
 Even given the teachings of Conley, which we must follow in all events, the plaintiff must allege sufficient facts in the complaint to survive a Rule 12(b)(6) motion. Confronted with such a motion, the court must review the allegations of fact contained in the complaint; for this purpose the court does not consider conclusory recitations of law. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a), F.R.Civ.P. (emphasis added). The Court of Appeals for the Second Circuit has held that dismissal with prejudice of a "bare bones" allegation of antitrust conspiracy without any supporting facts is appropriate where, as here, the plaintiff has already amended his complaint once with leave of the court. Heart Disease Research Found. v. General Motors Corp., 463 F.2d 98, 100 (2d Cir.1972). Moreover, in a case involving dismissal of an amended complaint, the Supreme Court noted that the plaintiff "had an adequate opportunity to amend its pleading to add failed allegations demonstrating that the District Court's decision to dismiss the complaint was based on a misunderstanding of its antitrust claim." Associated Gen. Contractors of Cal. v. California State Counsel of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Speaking through Justice Stevens, the Court stated:
 
 
 39
 As the case comes to us, we must assume that the [plaintiff] can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.
 
 
 40
 Id. at 526 n. 11.
 
 
 41
 Accordingly, we will review the plaintiff's amended complaint in detail, keeping in mind that Pennsylvania's rights rise no higher than the facts it has alleged, and that the defendants cannot be said to have violated the antitrust laws in ways that have not been alleged.
 
 C.
 
 42
 Both the original and the amended complaints alleged that PepsiCo had granted two bottlers, Allegheny and Confair, exclusive trademark licenses to bottle and sell PepsiCo soft drinks within exclusive geographic territories located in sections of Pennsylvania. App. at 6, 56. In both complaints Pennsylvania alleged that pursuant to the licenses, "defendants and their co-conspirators" refused to sell to retailers or other resellers who made a practice of reselling PepsiCo products to customers located outside the territory, in other bottlers' territories. Id. at 10, 59.
 
 
 43
 Both complaints also asserted that "defendants and their co-conspirators" refused to sell to resellers who bought PepsiCo products from or sold them to other resellers wherever located. Id. The Commonwealth alleged that bottlers were subject to monetary penalties if resellers in their territory engaged in shipping to customers located outside the territory. Id. The amended complaint added the allegation that "defendants and their co-conspirators" tracked any such shipping by means of a coding identification system. Id. at 58. Further, the original complaint alleged that "defendants and their co-conspirators" had "told" retailers not to sell to other retailers, and had "terminated" them as customers or "limited" their volume if they failed to comply. Id. at 10. The amended complaint revised this allegation, asserting that "defendants and their co-conspirators" would "combine with resellers not to sell soft drink to other resellers," and would "threaten" to either terminate them or limit their volume if they did not comply. Id. at 59.
 
 
 44
 The most prominent new feature in the amended complaint consisted of eight paragraphs of background allegations. The first of these substituted the word "resellers" for "retailers" (the term used in the original complaint), but defined "resellers" to include virtually every type of retailer who bought soft drinks from a bottler. Id. at 57. The amended complaint alleged that these resellers were independent from the bottlers and from PepsiCo. Id. at 58. It further alleged that Allegheny and Confair had territories that were proximate to one another, that they sometimes charged different prices from one another for the same item, and that they sometimes charged different prices to different customers for the same item within their own territories. Id. Finally, the amended complaint alleged that resellers bought from other resellers because their local bottler "charge[d] higher prices," refused to supply them, or limited their volume. Id.
 
 
 45
 In addition to the factual allegations, the amended complaint set forth two averments of law:23. Defendants' conduct consisted of, among other things, horizontal restraints of trade, group boycotts and agreements which, directly or indirectly, fixed or stabilized prices.
 
 
 46
 24. Defendants' conduct is not exempt from the antitrust laws under the defense provided by the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. Secs. 3501 et seq.
 
 
 47
 App. at 59-60.
 
 
 48
 In both the original and amended complaints, appellant concluded by requesting that the alleged agreements be "decreed per se unreasonable restraints of trade in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1," and that an injunction be issued against refusals to deal with resellers and against imposing any system "to enforce geographic bottling territories against resellers." App. at 11-12, 61.
 
 VI.
 
 49
 It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint. Because the soft drink industry is involved, Pennsylvania has a pleading burden much higher than that in a mine-run antitrust complaint. In a Rule 12(b)(6) motion resting on the Soft Drink Act, the district court should look only to the complaint's averments in order to make two critical determinations: what specific antitrust conduct was alleged in the complaint, and what conduct was permitted or not covered by the Act. Thus, in the case at bar, the legal theories set forth in Pennsylvania's brief are helpful only to the extent that they find support in the allegations set forth in the complaint. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1984). Accordingly, we cannot see much strength in two pillars supposedly constructed as mighty structures in Pennsylvania's horizontal conspiracy case.
 
 A.
 
 50
 First, Pennsylvania contends that it alleged in its complaint "[a] conspiracy between two soft drink bottlers, with or without the help of their syrup manufacturer, to eliminate competition by resellers and to boycott resellers...." Br. for appellant at 19. The representation in the brief, however, does not properly describe what was said in the complaint. The allegations in the amended complaint consistently refer to conduct by "defendants and their co-conspirators"--not otherwise identified. The complaint does not allege any agreement or conspiracy attributable solely to the competing bottlers, without PepsiCo. Moreover, Pennsylvania cannot base its claim on any conspiracy between PepsiCo and Allegheny. A parent company cannot conspire with its wholly owned subsidiary for purposes of section 1 of the Sherman Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3d Cir.1987).
 
 
 51
 Equally significant is the fact that Pennsylvania did not allege any meetings between Allegheny and Confair, any communications between them, or any other means by which their alleged conspiracy came about. This notwithstanding that in this circuit, "[o]nly allegations of conspiracy which are particularized ... will be deemed sufficient." Garshman v. Universal Resources Holding, Inc., 641 F.Supp. 1359, 1370 (D.N.J.1986), aff'd 824 F.2d 223 (3d Cir.1987) (quoting Kalmanovitz v. G. Heileman Brewing Co., 595 F.Supp. 1385, 1400 (D.Del.1984), aff'd, 769 F.2d 152 (3d Cir.1985)). Instead, all that appellant was apparently prepared to plead was a naked conclusion dropped into the amended complaint, reciting a bare-bones assertion that there had been a "horizontal" conspiracy.
 
 
 52
 Although the Supreme Court in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), addressed our present concern in the context of a motion for summary judgment and not a motion to dismiss, what the court said there is not irrelevant to our present inquiry: "[T]o survive a motion for summary judgment ... plaintiff ... must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Id. at 588, 106 S.Ct. at 1357 (quoting Monsanto v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).
 
 
 53
 In Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1108 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985), the court stated that the attachment of per se labels to defendants' conduct is inadequate in itself to sustain a complaint. "The defendants' alleged activity must be scrutinized to determine whether such a characterization is appropriate." Id. The court further remarked that the pleader may not evade the requirements of proper pleading "by merely alleging a bare legal conclusion." Id. at 1106. Thus, a plaintiff must plead the essential facts of a horizontal restraint or group boycott in order to plead either properly.
 
 
 54
 What this court said on this subject almost 50 years ago bears repeating:
 
 
 55
 The vital allegations [in stating a cause of action under the Sherman or Clayton Acts] are similar to those in any civil conspiracy case. A general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action. Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment. The plaintiffs have pleaded none of these facts. Neither the date of the alleged conspiracy nor its attendant circumstances are set forth. Nor is it averred who made the statements, where, when or to whom.
 
 
 56
 Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir.1941). The law in this regard has not changed. See Garshman v. Universal Resources Holding, Inc., 824 F.2d 223, 230 (3d Cir.1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act.") (citing Black & Yates ); Kalmanovitz v. G. Heileman Brewing Co., 595 F.Supp. 1385, 1400 (D.Del.1984), aff'd, 769 F.2d 152 (3d Cir.1985).
 
 
 57
 In Car Carriers, the Court of Appeals for the Seventh Circuit emphasized the importance of a consideration that has motivated this court over the years in insisting upon reasonable specificity in antitrust complaints. The court recognized that litigation today is too expensive a process to waste time on fanciful claims:
 
 
 58
 When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.
 
 
 59
 Car Carriers, 745 F.2d at 1106.
 
 
 60
 The same sentiment was expressed by Judge Pollak in Pao v. Holy Redeemer Hospital, 547 F.Supp. 484, 491 (E.D.Pa.1982), where the court dismissed a complaint with prejudice, saying:
 
 
 61
 Although this is plaintiff's second attempt to state a valid Sherman Act claim, the complaint still offers only uncertain clues as to plaintiff's theory of liability and the facts which would support a finding of Sherman Act liability. It is simply not fair to the defendants, and it would be an onerous imposition on the judicial process, to permit litigation to go forward on the basis of such conclusory and speculative allegations.
 
 
 62
 Likewise, in Havoco v. Shell Oil Co., 626 F.2d 549, 553 (7th Cir.1980), affirming dismissal of a complaint for failure to state a claim, the court stated:
 
 
 63
 [If] the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility.
 
 
 64
 There is no disagreement that the second section of the Soft Drink Act contains an exception for "price fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful." 15 U.S.C. Sec. 3502. The purpose of this section was to ensure that certain per se violations would be excluded from the approved enforcement of territorial exclusivity. H.Rep. No. 1118, reprinted in 1980 U.S. Code Cong. & Admin. News at 2373, 2389. But the factual allegations of the amended complaint did not come close to adequately pleading conduct amounting to any of these per se offenses, and this failure cannot be cured by simply reciting that appellees' conduct "consisted of" such offenses. Nor does it add anything to tack on an ipse dixit legal conclusion that appellees' conduct "is not exempt" under the Act.
 
 B.
 
 65
 Pennsylvania's other major contention supporting its horizontal conspiracy theory is the naked allegation, considerably fleshed out by brief and oral argument, that there was a group boycott by the defendants designed "to eliminate competition by resellers and to boycott resellers." Br. for appellant at 19. Here again, Pennsylvania recognizes the existence of the Soft Drink Act, but says that it does not apply because the defendants' activities come within the purview of the Act's exceptions for per se violations, including group boycotts. See 15 U.S.C. Sec. 3502. But Pennsylvania cannot travel very far on its group boycott argument.
 
 
 66
 This court has consistently limited application of the per se rule to the "classic" boycott. See Malley-Duff & Assocs. v. Crown Life Ins. Co., 734 F.2d 133, 142 (3d Cir.1984), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984) (quoting Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council, 670 F.2d 421, 430 (3d Cir.), cert. denied, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982)). A classic boycott exists where there is concerted action with "a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive object, or both." Id. (quoting De Filippo v. Ford Motor Co., 516 F.2d 1313, 1318 (3d Cir.1975), cert. denied, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975)).
 
 
 67
 Although dressed in the pejorative appellation "group boycott," the specific conduct complained of in this case, stripped of name-calling or label-pasting, is nothing more than conduct expressly permitted by the provisions of section 3501. What Pennsylvania now describes as a "group boycott" is precisely the conduct specifically authorized by the clear unambiguous language of the Soft Drink Act and its legislative history as set forth in Part II of this opinion. As we stated before, the Act provides for the "enforcement" of agreements limiting extraterritorial sales either "directly or indirectly." It is designed to combat and prevent transshipping by both bottlers and third parties. It is not for us to determine in this case what conduct would be permitted by a business enterprise not engaged in the manufacture and distribution of soft drinks. For our purposes here and now, we have decided that the Soft Drink Act applies to the entire chain of distribution--from the manufacturer all the way through to the consumer. It permits the manufacturer to require a bottler to ensure that the ultimate resale of the PepsiCo products it produces will be to consumers within its own territory. Thus, it allows bottlers to refuse to sell to resellers whose actions impede this goal.
 
 C.
 
 68
 This, too, must be said. We believe that to adopt Pennsylvania's view that section 3502 prevents the conduct described above would lead to a great inconsistency. On the one hand, this view would say that the Act grants suppliers the right to establish exclusive bottler territories; on the other hand, those territories could not be enforced because to do so would amount to a "horizontal restraint" or a "group boycott." We will not so implement this statute. It is well settled that "a statute should be interpreted so as not to render one part inoperative." Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979).
 
 
 69
 Equally important, we reject Pennsylvania's interpretation because it contradicts the express intent of Congress. When Congress enacted section 3502, it explicitly did not "tak[e] away ... what it gave in Sec. [3501]." 126 Cong.Rec. 16,576 (1980) (remarks by Rep. Butler). Nor did it intend "to vitiate the t[h]rust of section [3501]." Id. at 16,570 (remarks by Rep. Hall) (the Act "contemplates not only the existence but also the enforcement of bottler territories"). Rather, Congress enacted section 3502 to ensure that section 3501 did not sanction bottler-instigated market division or conspiracies among syrup manufacturers.
 
 
 70
 At the hearings on the Act, an attorney for a transshipper testified that unless a qualifying proviso like section 3502 were added, the first section of the Act would permit "bottlers [to] get together and form their own policing committees" and would permit the major syrup manufacturers to join together to "boycott" supermarket chains that transshipped. See 1980 Hearings 191-92. His interpretation of section 3501 concerned Judiciary Chairman Rodino that bottlers might create restraints on their own, and foist them upon their supplier. The Chairman asked the attorney if section 3501 would permit "bottlers [to] conspire[ ] to divide markets or allocate customers, and have their supplier ... enforce the agreement...." Id. at 195. The attorney replied that, unless qualified, it would. Id. This is the conduct that section 3502 was intended to address. But no such conduct was alleged in this case.
 
 
 71
 Section 3502 does not render bottlers impotent to seek enforcement of exclusive territories lawfully granted by the supplier, and that is all that is alleged here. On these facts, we reject the contention that section 3502 prevents the interposition of the Soft Drink Act as a total legal defense to the appellant's amended complaint.
 
 VII
 
 72
 We have carefully considered the contentions of the appellant, the Commonwealth of Pennsylvania. The judgment of the district court will be affirmed.
 
 
 
 [1]
 Because this Act is sui generis to the soft drink industry, we need not analyze at length the many cases on which Pennsylvania relies. Thus, even if the holding of Cernuto Inc. v. United Cabinet Co., 595 F.2d 164 (3d Cir.1979), survives the holding and rationale of Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), it is of no help. In Cernuto, there were no exclusive territories. The supplier had two competing dealers in the same area and the first dealer allegedly undertook to eliminate the second. The same was true in Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482 (3d Cir.1985), vacated and remanded, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986), on remand 823 F.2d 49 (3d Cir.1987). In United States v. General Motors Corp., 384 U.S. 127 (1966), the supplier had many dealers. Some of them discounted and the non-discounters persuaded the supplier to take action against the discounters. Pennsylvania's so-called group boycott cases are not relevant either. These spring from scenarios in which a group of competitors hatched a plan to eliminate a competitor at the same level of competition among themselves. They then issued ultimatums to all the suppliers or customers in their market. See St. Paul Fire & Marine Ins. Co. v. Bamy, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1961); Radiant Burners, Inc. v. Peoples Gas Light & Coal Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Fashion Originators' Guild v. FTC, 312 U.S. 457 (1941); Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930)