Stanley SHINN and Catherine Shinn, Husband and Wife, Plaintiffs,

v.

ENCORE MORTGAGE SERVICES, INC., and Sterling Home Mortgage Company, Defendants.

Civil Action No. 99–5773(JEI).

United States District Court, D. New Jersey.

May 8, 2000.

Lewis G. Adler, Woodbury, NJ, for Plaintiffs.

Sinko & Eisner by Michael D. Sinko, Haddonfield, NJ, for Defendant Encore Mortg. Services, Inc.

Reed Smith Shaw & McClay, LLP, by George E. McDavid, Princeton, NJ, for Defendant Sterling Home Mortg. Co.

## OPINION

IRENAS, District Judge.

Presently before the Court is defendant Sterling Home Mortgage Company's motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, this motion is granted.

### I.

The facts in this matter are undisputed. On or about December 10, 1998, plaintiffs borrowed $74,900 from defendant Encore Mortgage Services, Inc. ("Encore") in order to finance the purchase of a residential property in Oaklyn, New Jersey (the "Mortgage Loan"). In connection with the Mortgage Loan, plaintiffs executed and delivered to defendant Encore an Adjustable Rate Note (the "Note") and Mortgage. In addition to providing for a variable rate, the Note included a Prepayment Penalty Addendum, which provided that, in the event the Mortgage Loan is prepaid in full during the first 36 months of the loan term, plaintiffs agreed to pay a prepayment fee calculated in accordance with a specified formula. The Note and Mortgage were later assigned by defendant Encore to defendant Sterling Home Mortgage Company ("Sterling").

On January 25, 1999, approximately 45 days after the closing of the Mortgage Loan, plaintiffs refinanced their mortgage with Champion Mortgage. Plaintiffs then paid to defendant Sterling the entire outstanding balance of the Mortgage Loan together with a prepayment fee in the amount of $4,838.80.

On or about October 12, 1999, plaintiffs filed a complaint with the Superior Court of New Jersey, Law Division, Gloucester County. In Count I of this complaint, plaintiffs alleged that defendants Encore and Sterling violated N.J.S.A. 46:10B–1 *et seq.* (the "Prepayment Law"), which generally prohibits residential mortgage lenders from charging prepayment fees. In Count II, plaintiffs asserted a claim based on the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2 and in Count III, plaintiffs sought to certify a class action based on defendants' unlawful action as set forth in Counts I and II.

On or about November 4, 1999, plaintiffs amended their complaint to include a fourth Count, a Federal Truth in Lending Act claim. Subsequently, on December 9, 1999, defendant Encore removed the case to this Court. On or about January 3, 2000, defendant Encore filed an Answer to plaintiffs' Amended Complaint. On March 7, 1999, in lieu of filing an answer to plaintiffs' Amended Complaint, defendant Sterling filed the instant motion to dismiss. This motion was joined by defendant Encore.

In the present motion, Sterling asserts that its contractual right to collect a prepayment fee was not affected by the Prepayment Law.[1] Sterling advances three arguments in support of this assertion. First, Sterling argues that the Prepayment Law is preempted by the express provisions of the federal Alternative Mortgage Transactions Parity Act of 1982, 12 U.S.C. § 3801 *et seq.* ("Parity Act"). Second, Sterling cites to N.J.S.A. 46:10B–9 and argues that the Prepayment Law does not apply to any loan the prepayment of which is governed by any other New Jersey or federal law, and any loan which is made

---

**1.** Plaintiffs and Sterling agree that Counts II, III, and IV of plaintiffs' Amended Complaint are derivative of the claim, set forth in Count I, that defendants violated the Prepayment Law. Therefore, the Court's inquiry will be confined to this narrow issue and will not address any arguments with respect to the latter three counts of plaintiffs' Amended Complaint.

pursuant to any New Jersey or federal law which expressly authorizes interest charges in excess of 6% per year. Sterling states that both New Jersey's civil usury law, N.J.S.A. 31:1–1, and Section 501 of the federal Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1735–7a ("DIDA"), authorize interest charges in excess of 6% per year. Finally, Sterling argues that pursuant to the Prepayment Act, N.J.S.A. 46:10B–3, permits the charging of a prepayment fee on loans that are repaid in full within the first 18 months of the loan term.

## II.

Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept the allegations of the complaint as true. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of California, Inc., v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Also, when "[c]onfronted with [a 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

**2.** In its entirety, N.J.S.A. 46:10B–1 defines "mortgage loan" as "a loan secured by an interest in real property consisting of land upon which is erected or to be erected, in whole or in part with the proceeds of such loan, a structure containing one, two, three,

## III.

The Prepayment Law, N.J.S.A. 46:10B–2, states that "[p]repayment of a mortgage loan may be made by or on behalf of a mortgagor at any time without penalty." However, Sterling cites another section of the Prepayment Law, N.J.S.A. 46:10B–9, and argues that this section makes section 10B–2 inapplicable to plaintiffs' mortgage loan. N.J.S.A. 46:10B–9 provides that:

This Act shall not apply to loans secured by a mortgage on real property the prepayment of which is governed by any other statute of this state or of the United States, nor shall it apply to any loans secured by mortgage on real property, made pursuant to any statute of this State or of the United States expressly authorizing interest charges in excess of 6% per annum.

Sterling argues that two statutes, the federal Depository Institutions Deregulation and Monetary Control Act of 1980, § 1735–7a, and New Jersey's civil usury law, N.J.S.A. 31:1–1, *et seq.*, expressly authorize interest charges in excess of 6% on this loan. Thus, Sterling argues, 46:10B–2 does not apply to plaintiffs' mortgage loan.

The Court disagrees with Sterling's interpretation of the Prepayment Law. Section 10B–2 allows a mortgagor to prepay a "mortgage loan" without penalty. Pursuant to section 10B–1, a "mortgage loan" is defined as a loan "secured by an interest in real property ... upon which interest is taken or contracted for at a rate in excess of [6%]." [2] If the Court were to read section 10B–9 of the Law as Sterling suggests, then 46:10B–2 would have absolutely no application. Both sections 10B–2 and 10B–9 were passed in 1968. It is unlikely, to say the least, that the New Jersey Legislature would draft a statutory provision that was void from the moment it was

four, five or six dwelling units, a portion of which structure may be used for nonresidential purposes and upon which interest is taken or contracted for at a rate in excess of $6.00 for the forbearance of $100.00 for a year."

written. In order to avoid such an anomalous result and to give meaning to all sections of the Law, the Court interprets the phrase "secured by a mortgage on real property" used in section 10B–9 to encompass only those loans which are not "mortgage loans" as defined in section 10B–1. *See Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 1498, 146 L.Ed.2d 389 (2000)(recognizing "cardinal principle" of statutory construction that courts must give effect, if possible, to every clause and word of a statute); *see also K.V. Mart Co. v. United Food and Intern. Commercial Workers Union, Local 324,* 173 F.3d 1221, 1225 (9th Cir.1999)("Under accepted canons of statutory interpretation, [the court] must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.")(quoting *Boise Cascade Corp. v. U.S. E.P.A.,* 942 F.2d 1427, 1432 (9th Cir.1991)).

Under this interpretation, section 10B–9 applies to loans secured by an interest in real property which does not contain a structure containing between one and six units. Thus, section 10B–9 would apply to loans secured by an interest in real property upon which a structure is built, such as a large apartment complex, containing more than six units. Such an interpretation of the Prepayment Law comports with one of the overall purposes of the Law, to protect consumers. The New Jersey Legislature reasonably could have intended to protect individual mortgagors from being locked into long-term mortgages with excessive interest rates, but felt that more sophisticated commercial mortgagors needed no such protection. The Court

finds that section 10B–9 does not apply to "mortgage loans" as defined in section 10B–1, and thus, section 10B–2 does apply to plaintiffs' mortgage loan.

## IV.

■ Although the Prepayment Law, by its terms, applies to plaintiffs' mortgage loan, the Court finds that it is preempted by the Alternative Mortgage Transactions Parity Act, 12 U.S.C. § 3801 *et seq.* ("Parity Act"). The Parity Act was passed in 1982 as Title VIII of the Garn–St. Germain Depository Institutions Act in response to "increasingly volatile and dynamic changes in interest rates" which had made it difficult for consumers to purchase credit. 12 U.S.C. § 3801(a)(1).

Prior to the passage of the Act, in order to increase the availability of credit, the Office of the Comptroller of the Currency ("OCC"), the National Credit Administration ("NCUA"), and the Federal Home Loan Bank Board ("FHLBB") issued regulations authorizing federally chartered depository institutions to engage in "alternative mortgage financing." 12 U.S.C. § 3801(a)(3). An alternative mortgage is one which is not a traditional, fully amortized, fixed rate loan. 12 U.S.C. § 3802(1).[3] Although OCC, NCUA, and FHLBB regulations allowed federal lenders to engage in alternative mortgage transactions ("AMTs"), many states had laws which prevented state chartered lenders from engaging in AMTs. The Parity Act was passed to level the playing field. Specifically, the statute provides that:

It is the purpose of this chapter to eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors and pro-

---

**3.** The term "alternative mortgage transaction" is defined by the statute as a residential mortgage loan:

(A) in which the interest rate or finance charge may be adjusted or renegotiated;

(B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or

(C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation; described and defined by applicable regulation.

12 U.S.C. § 3802(1).

vide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the federal agencies.

12 U.S.C. § 3801(b).

The Act expressly preempts state laws which prohibit alternative mortgage transactions, "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law or regulation." 12 U.S.C. § 3803(c). However, in order to engage in alternative mortgage transactions and to reap the benefits of the Parity Act's preemption, state housing creditors must comply with the OTS's regulations governing federal savings and loan associations. 12 U.S.C. § 3803(a)(3). In 1996, the Office of Thrift Supervision ("OTS") adopted a regulation which clarified that state housing creditors, like their federal counterparts, were authorized to charge prepayment penalties and made clear that this regulation preempted contrary state laws.[4] 12 C.F.R. § 560.220.

■ Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, federal law preempts state law "either by express provision, by implication, or by a conflict between federal and state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). In other words, "[w]here a state statute conflicts with or frustrates federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). A valid federal regulation intended to displace state law has no less preemptive effect than a federal statute. *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *see also Freehold Cogeneration Associates v. Board of Regula-*

*tory Comm'rs of the State of New Jersey*, 44 F.3d 1178, 1190 (3d Cir.1995) ("Under the Supremacy Clause of the United States Constitution, a federal agency acting within the scope of its congressionally delegated authority has the power to preempt state regulation and render unenforceable state or local laws which are otherwise not inconsistent with federal law."). As long as the agency (1) intended to preempt state law; and (2) acted within the scope of its authority, federal regulations will displace conflicting state laws. *de la Cuesta*, 458 U.S. at 153–55, 102 S.Ct. 3014.

The OTS has clearly expressed its intent to preempt state laws which limit state creditors' ability to charge prepayment penalties in connection with AMTs. In 1996, the OTS adopted 12 C.F.R. § 560.220 which, by reference to 12 C.F.R. § 560.34, stated that prepayment penalties were covered by the Parity Act and subject to the Act's preemption provision. Also in 1996, the OTS issued an Opinion Letter which stated that the Parity Act preempted a Wisconsin statute limiting prepayment penalties. In the Opinion Letter, the OTS opined that a contrary interpretation would undermine the purposes of the Parity Act as state housing creditors "would be clearly disadvantaged vis-a-vis federal thrifts—the very result Congress intended to prevent." (Effect of Parity Act on Wisconsin Prepayment Penalty Statute, 1996 OTS LEXIS 19, *7).

■ Under the second prong of the inquiry set forth in *de la Cuesta*, the Court must determine whether the OTS had the authority to issue the regulations at issue. In examining the scope of the OTS's authority, the Court need not find that "Congress specifically intended—either explicitly or implicitly—to bestow preemptive authority" upon the OTS. *Conference of State Bank Supervisors v. Conover*, 710 F.2d 878, 882 (D.C.Cir.1983). As long as the regulations promulgated by the OTS

---

**4.** The Office of Thrift Supervision is the successor agency to the Federal Home Loan Bank Board. It was created principally to supervise and regulate federal and state savings associations, banks and credit unions.

are a "reasonable accommodation of the conflicting policies" committed to the agencies discretion, they will not be invalidated because of their preemptive effect. *U.S. v. Shimer*, 367 U.S. 374, 381–82, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961).

Under the Parity Act, Congress delegated to the Director of the OTS broad authority to regulate state housing creditors engaged in AMTs coextensive with the OTS's authority to regulate comparable federal housing creditors. *See* 12 U.S.C. § 3803(a)(3).[5] Similarly, under 12 U.S.C. § 1462a(b)(2), Congress vested the Director of the OTS with the authority to "prescribe such regulations and issue such orders as the Director may determine to be necessary for carrying out this chapter and all other laws within the Director's jurisdiction." Thus, it is clear that the Director of the OTS had the authority to promulgate 12 C.F.R. § 560.220 and to issue the 1996 Opinion Letter.

Plaintiffs argue that the Director's authority to issue regulations with respect to state housing creditors was limited to a 60–day period immediately following passage of the Parity Act. In support of this argument, plaintiffs cite to Section 807(b) of Public Law 97–320 which states:

> Within sixty days of the enactment of this title the ... Federal Home Loan Bank Board shall identify, describe and publish those portions or provisions of their respective regulations that are inappropriate for (and thus inapplicable to), or that need to be conformed for the use of, the nonfederally chartered housing creditors to which their regulations apply ...

According to plaintiffs, the OTS's rulemaking authority was limited to 60 days so that the states could make an informed choice whether to opt-out of the Parity Act. Pursuant to 12 U.S.C. § 3803(c), states were given three years, ending in 1985, to opt-out of the Act. New Jersey did not opt-out. Plaintiffs contend that to allow the OTS to amend those regulations applicable to state housing creditors after the opt-out period had expired would "sandbag" New Jersey into accepting the Parity Act without realizing its true effects. .

Sterling argues that section 807(b), which appears as an uncodified note to 12 U.S.C. § 3801, is not a limitation on the OTS's rulemaking authority. Sterling notes that instead of preparing a list of rules which would be inapplicable to state creditors, the OTS (through its predecessor, FHLBB) created a list of rules which state creditors would be required to follow in making AMTs. Sterling contends that this regulatory scheme is a reasonable interpretation of the Parity Act. Furthermore, Sterling argues that a 60–day limitation on the OTS's rulemaking authority would defeat the purposes of the Act because the regulations applicable to state versus federally chartered housing creditors would diverge over time, eliminating the parity created by the Act.

An identical argument was accepted by the District Court for the Eastern District of Virginia in *National Home Equity Mortg. Ass'n v. Face*, 64 F.Supp.2d 584 (E.D.Va.1999). In *Face*, the district court held that reading the 60–day period as an absolute bar on the OTS's rulemaking authority with respect to state chartered housing creditors would "defeat the stated purpose of the Parity Act by having regulations applicable to state and federally chartered housing creditors diverge over time rather than remaining in parity." *Id.* at 589. The Court also quoted from the legislative history of the Act which revealed that the list of regulations applicable to state housing creditors would be subject to amendment by the agency over time: "any future amendments that the agencies make to regulations that are within the scope of this title will conform to the objectives of this title." *Id.* (quoting S.Rep. No. 97–463, at 55 (1982)).

This Court agrees with the reasoning of the district court in *Face*. 12 U.S.C.

---

**5.** Congress previously granted the Director rulemaking authority with respect to federally chartered lenders under 12 U.S.C. §§ 1463(a) and 1464(a).

§ 3803(c) states that state housing creditors may engage in AMTs so long as they comply with "regulations ... issued by the Director of the [OTS] for federally chartered savings and loan associations, to the extent that such regulations are authorized by rulemaking authority ..." The language of the statute contains no "temporal limit" on the OTS's rulemaking authority. *Face*, 64 F.Supp.2d at 589. Furthermore, it is reasonable to assume that, as the legislative history indicates, Congress intended to give the OTS continuing rulemaking authority. Without such broad and continuing authority, the OTS could not ensure that the regulations under which state housing creditors operated kept pace with the regulations applicable to federal housing creditors.

The Court also rejects plaintiffs' argument that New Jersey was somehow "sandbagged" into accepting Parity Act preemption. In agreeing to the Act's preemption provision, the states accepted not only that state housing creditors would be governed by the OTS's regulations, but that the OTS would have the power to issue regulations "to the extent that such regulations are authorized by rulemaking authority ..." 12 U.S.C. § 3903(c). As stated by Judge Williams in *Face:*

> Congress gave the states a choice—the states could choose to be regulated by the federal regime under the Parity Act, or the states could choose to opt out of the preemption provision of the Parity Act and continue the state's own regime ... Virginia did not opt out during the requisite time period, and only now objects to the federal regime because the OTS has clarified that prepayment penalties are covered by the Parity Act.

64 F.Supp.2d at 588.
In failing to opt-out of the Parity Act, New Jersey chose to accept the federal "regime." *Id.* It cannot now rescind its decision to accept the Act's preemption merely because it disagrees with the OTS's current regulations.

Even if the OTS had the authority to issue the 1996 Opinion and regulation, plaintiffs argue that these "clarifications" are an unreasonable application of the Parity Act's preemption provision. Plaintiffs state that § 3803(c) was meant to preempt only those state laws that obstruct the making of AMTs. According to plaintiffs, prepayment penalties do not obstruct the creation of AMTs and, therefore, are not preempted by § 3803(c). Plaintiffs argue that such an interpretation is mandated by the plain language of § 3803(c) and the purpose of the Act "to foster the making of AMTs by nonfederal lenders." (Pls.' opp., 14).

Contrary to plaintiffs' characterization of the Act, the Court finds that § 3803(c) does not limit the preemptive effect of the Act to state laws which would completely prohibit or obstruct the creation of AMTs. Section 3803(c) states only that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." The language of this section does not support plaintiffs' narrow interpretation of the statute's preemptive effect. Nor does the Court agree that the sole purpose of the Act is to enable state lenders to engage in AMTs. A paramount purpose of the Act is create parity between state and federal lenders who engage in AMTs. The Court finds that the 1996 Opinion and the OTS's regulations governing prepayment penalties are, to the extent that they preempt state law, a permissible interpretation of the congressional authority vested in the OTS under the Parity Act.

The undisputed facts indicate that defendant Encore qualifies as "housing creditor" under 12 U.S.C. § 3802(C) and that defendant Sterling qualifies under 12 U.S.C. § 3802(D).[6] Also, plaintiffs do not dispute that the mortgage transaction at

---

**6.** Plaintiffs argue that even if New Jersey's prepayment law is preempted by the Parity Act, Sterling is not subject to the Parity Act's preemption because Sterling is not a "housing creditor" as defined at 12 U.S.C.

issue meets the definition of an "alternative mortgage transaction" set forth at 12 U.S.C. § 3802(1). Furthermore, plaintiffs do not suggest that Encore or Sterling failed to comply with the applicable regulations issued by the OTS. Because Encore and Sterling meet all of these statutory definitions and requirements, plaintiffs' mortgage loan is subject to the protections of the Parity Act and the regulations promulgated thereunder.[7]

## V.

For the reasons set forth above, the Court finds that the New Jersey Prepayment Law, N.J.S.A. 46:10B–1, *et seq.*, is preempted by the Alternative Mortgage Transactions Parity Act, 12 U.S.C. § 3801 *et seq.* and 12 C.F.R. § 560.220. Accordingly, defendant Sterling's motion to dismiss is granted. The Court will issue an appropriate order.

§ 3802(2)(D). Under § 3802(2)(D), to qualify as a "housing creditor" a lender must be licensed in the relevant state. Plaintiffs have attached to their motion papers a report from the New Jersey Department of the Treasury which states that Sterling has not been authorized to conduct business in New Jersey since April 16, 1999. (Pls.' Ex. 5).

In response, Sterling contends that it was licensed to conduct business in New Jersey at the time it collected a prepayment fee from plaintiffs on January 25, 1999. Because there is no evidence that Sterling was not licensed to do business at the time it collected the prepayment fee from plaintiffs, the Court agrees that Sterling meets the statutory definition of a "housing creditor" under the Parity Act. *See* 12 U.S.C. § 3802(2).

7. Because the Court has determined that the Prepayment Law is preempted by the Parity Act and the OTS's regulations, the Court will not address Sterling's argument that N.J.S.A. 46:10B–3, permits the charging of a prepayment fee on loans that are repaid in full within the first 18 months of the loan term.