821 A.2d 485 (2003)
360 N.J. Super. 1
Mark GLUKOWSKY, Plaintiff-Appellant,
v.
EQUITY ONE, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted February 5, 2003.
Decided April 24, 2003.
*490 Lewis G. Adler, attorney for appellant (Mr. Adler, Roger C. Mattson and Louis D. Fletcher, on the brief).
Reed Smith, attorneys for respondent (Lauren Graham Delehey, of counsel; Leonard A. Bernstein, Robert M. Jaworski and Ms. Delehey, on the brief).
Before Judges KING, WEFING and LISA. *486 *487 *488
*489 The opinion of the court was delivered by KING, P.J.A.D.
This case presents a question of federal preemption of state law respecting prepayment fees for residential mortgages. We find no federal preemption, reverse and remand for further proceedings.

I
In 1999, plaintiff secured a residential mortgage from defendant in the amount of $72,000. This was a so-called "balloon loan," meaning that the debt matures at the end of an interval shorter than the terms of the amortization schedule. At the maturity date, in 2009, plaintiff would still owe $62,021.25. This is considered an alternative mortgage transaction (AMT) under federal law. AMTs are all residential mortgages other than traditional, fixed-term, fixed-rate mortgages.
In 2001, plaintiff sold the mortgaged property. At that time, plaintiff prepaid the remaining loan balance plus a prepayment fee amounting to two percent of the principal balance of the loan ($1,427.97). The prepayment fee was calculated under the terms of a "Prepayment Rider" to the mortgage contract.
Plaintiff then filed suit alleging that prepayment fees, regardless of their amount, violate New Jersey law, relying upon the Prepayment Law, N.J.S.A. 46:10B-1 to -11.1; the Market Rate Consumer Loan Act, N.J.S.A. 17:3B-4 to -27; and the Consumer Fraud Act, N.J.S.A. 56:8-1 to -2.13. Upon defendant's motion, the Law Division judge dismissed the complaint, under R. 4:6-2(e), for failure to state a claim upon which relief can be granted, holding that the state law claims were preempted by federal law.
The questions presented on this appeal are: (1) whether the complaint states a claim for which relief may be granted under *491 New Jersey law, and (2) whether any valid state law claims nevertheless must be dismissed because they are preempted by federal law.
Plaintiff also contends that he should be permitted to amend the complaint to assert claims under: (1) a federal due-on-sale regulation, 12 C.F.R. § 591.5(b)(2)(i), which prohibits housing lenders from collecting prepayment fees where they have demanded prepayment of the mortgage under the mortgage contract's due-on-sale clause (A due-on-sale clause is "a contractual provision that permits the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred." Fid. Fed. Sav. and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 145, 102 S.Ct. 3014, 3018, 73 L.Ed.2d 664, 670 (1982)); (2) the Licensed Lenders Act, N.J.S.A. 17:11C-1 to -49, and one of the regulations adopted thereunder, N.J.A.C. 3:15-10.1, which prohibits prepayment fees; and (3) general contract law principles which prohibit unconscionable contract terms, such as the Prepayment Rider to the mortgage contract. Plaintiff does not explicitly request permission to amend the complaint to assert these claims. Instead, he argues as though these claims are pled in the complaint. Since they clearly are not, we treat plaintiff's arguments as requests for permission to amend the complaint.
As to the preemption issue, the central issue on appeal, there clearly exists a direct conflict between state and federal law regarding whether prepayment penalties may be charged in alternative mortgage transactions. New Jersey explicitly prohibits state-chartered housing creditors from collecting prepayment penalties, with respect to any residential mortgage transaction. See N.J.S.A. 46:10B-2. On the other hand, a 1996 federal regulation, issued by the Office of Thrift Supervision (OTS), permits state-chartered housing creditors to charge prepayment fees in alternative mortgage transactions. See 12 C.F.R. § 560.220 (incorporating 12 C.F.R. § 560.34, which permits federally chartered housing creditors to collect prepayment penalties, and applying it to state-chartered housing creditors with respect to AMTs). The OTS adopted 12 C.F.R. § 560.220 pursuant to authority delegated to it by Congress, under the Alternative Mortgage Transactions Parity Act (Parity Act), 12 U.S.C.A. § 3801 to § 3806. Furthermore, in adopting 12 C.F.R. § 560.220, the OTS expressly stated that this regulation was intended to preempt state law to the contrary.
Thus, we must hold that 12 C.F.R. § 560.220 preempts plaintiff's state law claims challenging the prepayment fee unless we find that in issuing this regulation the OTS acted arbitrarily, or exceeded the authority delegated to it by Congress. This is the nub of the preemption issue. Plaintiff contends that 12 C.F.R. § 560.220 is invalid because, in issuing it, the OTS exceeded the authority delegated to it by Congress under the Parity Act. We agree.
In finding federal preemption, and dismissing the complaint, the Law Division judge primarily relied upon two published federal court decisions in which the courts held that 12 C.F.R. § 560.220 was a valid exercise of the OTS's delegated authority, and that 12 C.F.R. § 560.220 preempted state laws regulating prepayment feesat least to the extent those state laws are applied in the context of alternative mortgage transactions. See Nat'l Home Equity Mortgage Ass'n v. Face (Face) 239 F.3d 633 (4th Cir.), cert. denied, 534 U.S. 823, 122 S.Ct. 58, 151 L.Ed.2d 26 (2001); Shinn v. Encore Mortgage Serv., Inc., 96 F.Supp.2d 419, 422 (D.N.J.2000).
*492 Since the Law Division judge entered judgment, however, there has been a significant, albeit unusual, development, which casts doubt on these federal decisions and subjects them to closer scrutiny. Specifically, in April 2002, the OTS published a Notice of Proposed Rulemaking in which it repudiated 12 C.F.R. § 560.220 and put forth a number of arguments which support a conclusion that, in adopting 12 C.F.R. § 560.220 in 1996, the OTS acted arbitrarily and exceeded the authority delegated to it by Congress. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. 20,468 (Apr. 25, 2002). Subsequently, the OTS adopted that Proposed Rulemaking as final. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg., 60,542 (Sept. 26, 2002). We agree with the arguments advanced by the OTS and find they are supported by a recent case from the California Court of Appeals, in which that court discussed the limited nature of the Parity Act's preemption clause, although in a context different than presented in this case. See Black v. Fin. Freedom Senior Funding Corp., 92 Cal.App.4th 917, 112 Cal.Rptr.2d 445, 457 (2001), cert. denied sub nom., ULLICO, Inc. v. Black, 536 U.S. 959, 122 S.Ct. 2662, 153 L.Ed.2d 837 (2002).
We reverse the rulings of the Law Division judge, in part. We hold that plaintiff's state law claims are not preempted by 12 C.F.R. § 560.220 because this regulation was adopted arbitrarily, and exceeds the scope of authority Congress delegated to the OTS under the Parity Act. We remand for further proceedings on plaintiff's claims under the Prepayment Law and the Consumer Fraud Act. We affirm dismissal of plaintiff's claim under the Market Rate Consumer Loan Act because defendant is not an entity covered by this statute. Finally on remand, plaintiff is permitted to amend the complaint to assert claims under the federal due-on-sale regulation, 12 C.F.R. § 591.5(e)(2)(i); N.J.A.C. 3:15-10.1(b) and general contract principles; defendant may raise the issue of retroactivity.

II
This is the procedural context. On May 17, 2002 plaintiff filed a complaint alleging that in collecting a prepayment fee with respect to the prepayment of his mortgage defendant violated New Jersey's Prepayment Law, N.J.S.A. 46:10B-2, and the Market Rate Consumer Loan Act, N.J.S.A. 17:3B-22. Plaintiff also alleged that collection of a prepayment fee constituted an unconscionable business practice, in violation of the Consumer Fraud Act, N.J.S.A. 56:8-2. Plaintiff also sought class certification.
In lieu of an answer, defendant filed a motion to dismiss, under R. 4:6-2, for failure to state a claim upon which relief may be granted. Plaintiff opposed that motion, and filed a cross-motion for summary judgment, which defendants opposed. After hearing oral argument on January 18, 2002 the judge issued an oral decision, granting defendant's motion, and denying plaintiff's cross-motion.

III
Defendant is a Delaware corporation, which maintains an office in Mount Laurel, Burlington County. Defendant is licensed under New Jersey's Licensed Lenders Act and engages in the business of residential mortgage lending.
On October 29, 1999 plaintiff and a co-borrower financed the purchase of a residence, located at 133-135 Route 530 (Pemberton Road), Southampton, Burlington County, with a mortgage loan secured from defendant. The total amount of the mortgage was $72,000, and the maturity *493 date was November 1, 2009. The mortgage contract provided for federal and New Jersey law to control the transaction.
The mortgage is considered a "balloon loan." At maturity, plaintiff would still owe $62,021.25 of the principal and would be obligated to repay that entire amount, or obtain refinancing from defendant or another mortgage lender. Under the terms of the mortgage, defendant reserved the right not to refinance the loan.
Of particular relevance to this case is the Prepayment Rider to the mortgage's "Balloon Note." The Prepayment Rider imposes a prepayment fee if the mortgage is prepaid in full during the first three years of the loan term. Specifically, the Prepayment Rider states:
4. BORROWER'S RIGHT TO REPAY
I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may make a partial prepayment without paying the prepayment charge. If I make a full prepayment within one (1) year of the date of this Note, I agree to pay a prepayment charge of 3.0000% of the amount being prepaid; If I make a full prepayment more than one (1) year but within two (2) years of the date of this Note, I agree to pay a prepayment charge of 2.0000% of the amount being prepaid; if I make a full prepayment more than two (2) years but within three (3) years of the date of this Note, I agree to pay a prepayment charge of 1.0000% of the amount being prepaid. If I make full prepayment more than three (3) years after the date of this Note, there will be no prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

[ (emphasis added).]
The Prepayment Rider amended language in the "Balloon Note," under which no prepayment penalties could be imposed.
Also relevant is Section 17 of the mortgage contract, the so-called due-on-sale clause, which states, in pertinent part, as follows:
17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred ... without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.
*494 On or about April 11, 2001 defendant provided a payoff statement to plaintiff, stating that the mortgage was in default and if not brought current, could be referred to an attorney for foreclosure. The Payoff Statement reflected the amount needed to prepay the mortgage in full, which included the remaining principal balance, interest, various fees and late charges, plus a prepayment fee of $1,427.97. Plaintiff sold the property, and on April 19, 2001 paid the amount indicated in the Payoff Statement, including the prepayment fee.

SUMMARY OF APPLICABLE LAW
This case involves a spider's web of federal and state statutes and regulations governing mortgage transactions. To complicate things, the parties dispute which statutes and regulations actually apply in the context of this case.
We provide summaries of the statutes and regulations at issue in this case. We also summarily resolve some of the parties' more specious arguments, regarding the applicability of the various statutes and regulations, in our attempt to narrow the issues presented.

State Statutes and Regulations
The complaint alleges violations of three New Jersey statutes: (1) the Prepayment Law; (2) the Market Rate Consumer Loan Act; and (3) the Consumer Fraud Act. On appeal, plaintiff also essentially requests permission to amend the complaint, to assert a claim under the New Jersey Licensed Lenders Act, N.J.S.A. 17:11C-1 to -49, and N.J.A.C. 3:15-10.1, a regulation adopted under N.J.S.A. 17:11C-49.

The Prepayment Law
New Jersey's Prepayment Law provides that "[p]repayment of a mortgage loan may be made by or on behalf of a mortgagor at any time without penalty." N.J.S.A. 46:10B-2. The statute defines "prepayment" as "payment in full of the balance owing on a mortgage loan at any time prior to the time limited for the final payment of such loan in an instrument evidencing such loan." N.J.S.A. 46:10B-1(c).
The Prepayment Law also provides for a limited right to make partial prepayments of mortgage principal, without incurring a prepayment fee. Specifically, N.J.S.A. 46:10B-3 provides as follows:
A mortgagor shall have the right, during any 6 month period beginning with the date of the mortgage loan, to pay, without charge or penalty, an additional sum of $50.00, or multiples thereof, on account of the principal amount owing on a mortgage loan, provided that the additional sums so paid and the principal payments required to be made by the terms of such mortgage loan during such 6 month period do not together exceed in any such 6 month period 33-1/3% of the face amount of such mortgage loan. The right to make additional payments as provided by this section shall not be cumulative, and to the extent that it is not exercised during any 6 month period, shall lapse.
In addition, the Prepayment Law provides that no provision of a mortgage which denies the rights conferred by the above sections [N.J.S.A. 46:10B-2 and N.J.S.A. 46:10B-3] shall be enforceable, N.J.S.A. 46:10B-4, and that any prepayment fees collected in knowing violation of the statute must be repaid, with interest calculated at six percent per annum. N.J.S.A. 46:10B-5.
Finally, the Prepayment Law provides that:
This act shall not apply to loans secured by a mortgage on real property the prepayment *495 of which is governed by any other statute of this State or of the United States, nor shall it apply to any loans, secured by mortgage on real property, made pursuant to any statute of this State or of the United States expressly authorizing interest charges in excess of 6% per annum.
[N.J.S.A. 46:10B-9.]

The Market Rate Consumer Loan Act
As its name implies, the Market Rate Consumer Loan Act regulates consumer loan transactions. N.J.S.A. 17:3B-4 to -27. It applies to loans offered by "lenders," with "lenders" defined as: (1) "banking institutions" (defined as banks, out-of-state or out-of-country banks having a branch office in New Jersey, savings banks, and national banking associations having a principal or a branch office in New Jersey); (2) federally chartered savings banks; and (3) "associations" (defined as state associations, federal associations having a principal or a branch office in New Jersey, and out-of-state associations having a branch office in New Jersey). N.J.S.A. 17:3B-5(d); N.J.S.A. 17:9A-1(2); N.J.S.A. 17:12B-5(3).
The Market Rate Consumer Loan Act prohibits lenders, as defined above, from charging prepayment fees, as follows:
a. An individual borrower may prepay a loan in full at any time without payment of any prepayment charge.
b. If a borrower wishes to prepay a loan, a lender shall not use the "rule of 78's" to calculate the amount of interest owed by the borrower. The lender shall use a simple interest basis to calculate the amount of interest owed by the borrower.
[N.J.S.A. 17:3B-22.]

Consumer Fraud Act
The Consumer Fraud Act prohibits "unconscionable commercial practices." N.J.S.A. 56:8-2. It also provides for a private right of action, to recover monies lost as a result of such practices, N.J.S.A. 56:8-2.12, and states that the rights protected under the Act are cumulative of other rights and remedies under New Jersey law. N.J.S.A. 56:8-2.13.

New Jersey Licensed Lenders Act
Defendant is licensed as, among other things, a "mortgage banker," under the New Jersey Licensed Lenders Act (Licensed Lenders Act). N.J.S.A. 17:11C-1 to -49. A regulation adopted, in part, under the Licensed Lenders Act, N.J.S.A. 17:11C-49, provides that: "[a] borrower may repay a first mortgage loan, second mortgage loan or consumer loan at any time without penalty." N.J.A.C. 3:15-10.1(b). See also N.J.A.C., Title 3, Ch. 15, References and Annotations.

Federal Statutes and Regulations The Parity Act
The only federal law of significance to this litigation is: (1) the Parity Act, 12 U.S.C.A. § 3801 to § 3806, which was adopted in 1982; and (2) a regulation adopted by the OTS, under the Parity Act, in 1996, 12 C.F.R. § 560.220. It is 12 C.F.R. § 560.220 which allegedly preempts plaintiff's state law claims.

Purpose of the Parity Act
Prior to passage of the Parity Act, federal regulations permitted federally chartered housing lenders to engage in AMTs. Many states, however, prohibited state-chartered housing lenders (also referred to as "non-federally chartered housing lenders") from engaging in AMTs. Shinn, 96 F.Supp.2d at 422.
*496 The purpose of the Parity Act was to provide parity between federally chartered and state-chartered housing lenders, "by authorizing all housing creditors to make, purchase and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued" by the relevant federal agencies. 12 U.S.C.A. § 3801(b) (emphasis added). The relevant federal agencies, issuing regulations under the Parity Act, are: (1) the Comptroller of the Currency, which issues regulations applicable to national banks; (2) the National Credit Union Administration, which issues regulations applicable to national credit unions; and (3) the OTS, which issues regulations applicable to all other housing creditors, for example, savings and loan associations, mutual savings banks, and savings banks. 12 U.S.C.A. § 3801(a)(3), § 3803(a). Shinn, 96 F.Supp.2d at 422-23. (As originally worded, the Parity Act referenced the "Federal Home Loan Bank Board," (FHLBB), which is the predecessor to the OTS). Glass v. United States, 258 F.3d 1349, 1352, n. 3, as amended by, 273 F.3d 1072 (Fed.Cir.2001); Turner v. First Union Nat'l Bank, 162 N.J. 75, 87, n. 2, 740 A.2d 1081 (1999).
Congress passed the Parity Act in 1982 in response to "increasingly volatile and dynamic changes in interest rates," which Congress found "seriously impaired the ability of housing creditors to provide consumers" with traditional residential mortgages. 12 U.S.C.A. § 3801(a)(1). The Act represented the congressional response to a concern that state bans on AMTs "would reduce the overall availability of mortgage credit, since fixed-rate mortgages had become relatively more expensive as the result of increased interest-rate volatility." Grunbeck v. Dime Sav. Bank of New York, FSB, 74 F.3d 331, 343 (1st Cir.1996). Congress believed that AMTs were "essential to the provision of an adequate supply of credit secured by residential property necessary to meet the demand expected during the 1980's." 12 U.S.C.A. § 3801(a)(2).

Definitional Provisions
The Parity Act defines AMTs as follows:
(1) the term "alternative mortgage transaction" means a loan or credit sale secured by an interest in residential real property, a dwelling, all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a residential manufactured home ...
(A) in which the interest rate or finance charge may be adjusted or renegotiated;
(B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or
(C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation;

[12 U.S.C.A. § 3802(1).]
The term AMT "is a broad catch-all term for all manner of mortgage instruments that do not conform to the traditional fully-amortized, fixed-interest-rate mortgage loan." First Gibraltar Bank, FSB v. Morales, 19 F.3d 1032, 1037 (5th Cir.), cert. denied, 513 U.S. 876, 115 S.Ct. 204, 130 L. Ed.2d 134 (1994), vacated on other grounds, 42 F.3d 895 (5th Cir.1995).
Although plaintiff disputes this fact, it is clear that the mortgage at issue in the present case qualifies as an AMT under 12 U.S.C.A. § 3802(1)(B) or (C). Specifically, although it is a fixed-rate, *497 fixed-term mortgage, the debt matures at the end of an interval shorter than the term of the amortization schedule, thereby implicitly permitting rate adjustments under 12 U.S.C.A. § 3802(1)(B).
The mortgage also constitutes a balloon loan, which is not the traditional, fixed-rate, fixed-term mortgage. 12 U.S.C.A. § 3802(1)(C). Plaintiff's contention that the mortgage at issue is not a balloon note is incorrect. Black's Law Dictionary (6th ed.1991) defines "balloon note" as "[a] form of promissory note which commonly calls for minimum payments of principal, if any, and the payment of interest at regular intervals, but which requires a substantial payment of principal at the end of the term; the final payment frequently representing all the principal." The mortgage at issue clearly fits this definition.
There is also no real dispute that defendant is a "housing creditor," as defined by the Parity Act, 12 U.S.C.A. § 3802(2), since defendant is engaged in the business of making residential mortgage loans, 12 U.S.C.A. § 3802(2)(C), and is licensed under New Jersey law to enter into AMTs, 12 U.S.C.A. § 3802(2). While plaintiff disputes that defendant is a "Licensed Lender," under New Jersey law, defendant has provided copies of its state-issued licenses to substantiate this fact.

Substantive Provisions of the Parity Act
Substantively, the Parity Act provides that all housing creditors (both federally chartered and non-federally chartered) may make, purchase, and enforce AMTs, so long as the transactions are made in accordance with regulations governing AMTs, as issued by the relevant federal agenciesthe Comptroller of the Currency, the National Credit Union Administration Board, and the OTS. 12 U.S.C.A. § 3803(a).
The Parity Act also contains an express provision relating to the preemption of state law, which states as follows:
An alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation.
[12 U.S.C.A. § 3803(c).]
The statute further provided for a limited time-frame, after the effective date of the Parity Act, during which states could choose to opt out of the Parity Act. In order to opt out, during that limited time-frame, states were required to pass a law stating "explicitly and by its terms that such State does not want the preemption provided in [12 U.S.C.A. § 3803] to apply with respect to alternative mortgage transactions (or to any class or type of alternative mortgage transaction) subject to the laws of such State ..." 12 U.S.C.A. § 3804(a).
New Jersey did not opt out of the Parity Act. This fact has been acknowledged by the Office of the Attorney General of the State of New Jersey, in an extensive formal opinion of March 6, 1987, and was recognized in Shinn, 96 F.Supp.2d at 424. Plaintiff also admits this in his brief. Plaintiff's relatively brief argument, claiming that New Jersey did opt out of the Parity Act, is specious and is rejected. We also note that the statute plaintiff identifies as New Jersey's official "opt-out" of the Parity Act, the Market Rate Consumer Loan Act, does not explicitly state that New Jersey was opting out of Parity Act preemption. Indeed, the statute contains no reference whatsoever to the Parity Act. N.J.S.A. 17:3B-4 to -27. Therefore, it does not constitute an "opt-out" of Parity Act preemption, as defined by 12 U.S.C.A. § 3804(a).

*498 Relevant Federal Regulations Adopted Pursuant to the Parity Act

The parties do not dispute that, under the Parity Act, the relevant federal agency in the present case is the OTS. In 1996, the OTS adopted a regulation which clarified that state-chartered housing creditors, like their federal counterparts, are authorized to charge prepayment penalties. Specifically, in 12 C.F.R. § 560.220, the OTS determined that, as an exercise of its delegated powers under the Parity Act, 12 U.S.C.A. § 3803(a)(3), and thus in preemption of all contrary state law under 12 U.S.C.A. § 3803(c), the provisions of 12 C.F.R. § 560.34 should be applied to AMTs issued by state-chartered housing creditors. The OTS adopted 12 C.F.R. § 560.34 pursuant to the authority delegated to it under the Home Owners' Loan Act (HOLA), 12 U.S.C.A. § 1461 to § 1470. See 12 C.F.R. § 560.1(a). 12 C.F.R. § 560.34 provides as follows:
Any prepayment on a real estate loan must be applied directly to reduce the principal balance on the loan unless the loan contract or the borrower specifies otherwise. Subject to the terms of the loan contract, a Federal savings association may impose a fee for any prepayment of a loan.

[(emphasis added).]

The Depository Institutions Deregulation and Monetary Control Act
Plaintiff also claims that the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA) is relevant to this case. DIDA was passed in response to congressional concern that state interest-rate ceilings were depressing home mortgage interest rates to below-market levels, thereby artificially disrupting the availability of funds for both traditional fixed-rate mortgages and AMTs. Grunbeck, 74 F.3d at 343-44. Defendant claims DIDA is irrelevant to this case.
In fact, no aspect of DIDA is directly implicated by this case. DIDA may be considered relevant only to the extent its preemption clause may be compared and contrasted to that of the Parity Act's. DIDA's preemption clause states as follows:
(a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under subchapter I or II of this chapter.
(b) The provisions of subsection (a) shall apply to loans, mortgages, or advances made or executed in any State until the effective date (after December 21, 1979) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance.

[12 U.S.C.A. § 1735f-7.]
DIDA's preemption provision is different from the Parity Act's in one significant respect. Clearly, DIDA's preemption provision was not intended to prevent state limitations on prepayment charges. Grunbeck, 74 F.3d at 340 (citing 1980 U.S.C.C.A.N. at 255). This fact is confirmed in the applicable federal regulation, which provides that nothing in DIDA "preempts limitations in state laws on prepayment charges, attorneys' fees, late charges or other provisions designed to protect borrowers." 12 C.F.R. § 590.3(c).
*499 Plaintiff's additional contention, that DIDA is relevant to the Parity Act, because the two statutes overlap, is technically accurate. However, that statutory overlap is of no significance. Specifically, the Parity Act provides that Section 501(c)(1) of DIDA, 12 U.S.C.A. § 1735f-7a(c)(1), shall not apply to transactions subject to the Parity Act. 12 U.S.C.A. § 3805. Roughly, Section 501(c)(1) of DIDA provides that DIDA preemption shall not apply to a mortgage which is secured by a first lien on a manufactured residential home, unless the terms and conditions of that mortgage comply with the consumer protection provisions specified in regulations prescribed by the Federal Home Loan Bank Board (FHLBB), regarding, for example, balloon payments, prepayment penalties, late charges and deferral fees. 12 U.S.C.A. § 1735f-7a(c).
Thus, all the Parity Act intended, by stating that Section 501(c)(1) of DIDA does not apply to transactions subject to the Parity Act, is that "certain federal consumer protection provisions with respect to balloon payments, prepayment penalties, late charges and deferral fees that are applicable in connection with mobile home transactions are not applicable to transactions authorized by the [Parity] Act." Alan S. Kaplinsky, "Federal Usury Law Developments," Practicing Law Institute, Commercial Law and Practice Course Handbook Series, Consumer Financial Services Litigation (1998).
Neither party in the present case contends that the mortgage transaction involved a mobile home. Therefore, neither 501(c)(1) of DIDA nor 12 U.S.C.A. § 3805 are implicated.

Federal "Due-on-Sale" Regulation
Finally, plaintiff requests permission to amend the complaint, to state a claim under the federal due-on-sale regulation. 12 C.F.R. § 591.5(b)(2)(i). Pursuant to authority granted under HOLA and DIDA, the OTS has issued regulations, permanently preempting state prohibitions on the exercise of due-on-sale clauses by all lenders, whether federally or state-chartered. 12 C.F.R. § 591.1 to 591.6. These regulations apply to all real property loans and all lenders making such loans. 12 C.F.R. § 591.1.
Under these regulations, specifically 12 C.F.R. § 591.5(b)(2)(i), no prepayment fee may be imposed where a residential mortgage lender declares, by written notice, that it is exercising a due-on-sale clause in the mortgage instrument.

IV
During oral argument on the parties' cross-motions, the Law Division judge did not engage in any analysis of plaintiff's state law claims to determine whether they stated a cause of action. Instead, the judge presumed the validity of the state law claims and turned to the federal preemption analysis, dismissing the complaint on that basis. This is the analytical framework defendant urges on appeal.
Although it may seem unusual to consider the question of federal preemption, before determining whether plaintiff states a valid state law claim, this is the procedure we follow here. The issue of preemption is the most important one presented in this case. We conclude that the state law claims are not preempted because, in adopting 12 C.F.R. § 560.220, the OTS acted arbitrarily, and exceeded the authority delegated by Congress under the Parity Act.

Federal Preemption In General
The question of federal preemption is a question of law, subject to de novo review. New Jersey Payphone Ass'n, Inc. v. Town of West New York, 299 F.3d 235, *500 242 (3d Cir.2002). Congress's power to preempt state law is derived from the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2; Fidelity, 458 U.S. at 152, 102 S.Ct. at 3022, 73 L. Ed.2d at 674; Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 366 (3d Cir.1999); Turner, 162 N.J. at 87, 740 A.2d 1081. Congress may choose to occupy a field, taking all regulatory authority over a certain subject matter. Alternatively, it may share the field with the states, or adopt as federal policy the state scheme of regulation. The ultimate question in each case is one of congressional intent. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947); Abdullah, 181 F.3d at 366. The presumption, however, is that Congress did not intend to supplant state law. Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595 (1981); Abdullah, 181 F.3d at 366.
In determining whether Congress intended to preempt state law, the starting point is the statutory language. "Preemption may be either express or implied, and `is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Fidelity, 458 U.S. at 152-53, 102 S.Ct. at 3022, 73 L.Ed.2d at 675 (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977)).
Absent explicit preemptive language, Congress' intent to supersede state law altogether may be inferred because "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose."
[Id., 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675 (quoting Rice, 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459).]
Accord, Turner, 162 N.J. at 87-88, 740 A.2d 1081.
Even where Congress has not completely displaced state regulation in a particular subject matter, state law will be nullified to the extent it actually conflicts with federal law, i.e., to the extent compliance with both federal and state law is a physical impossibility, or to the extent state law is an obstacle to the accomplishment of Congressional objectives. Fidelity, 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675.

Preemptive Effect of Federal Regulations
Federal regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 703 (1984) (emphasis added). Subject to this qualification, federal regulations have the same preemptive effect as federal statutes:
Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. United States v. Shimer, 367 U.S. 374, 381-82, 81 S.Ct. 1554, 1559-60, 6 L.Ed.2d 908, 913-14 (1961). When the administrator promulgates regulations intended to pre-empt state *501 law, the court's inquiry is similarly limited:
"If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Id., 367 U.S. at 383, 81 S.Ct. at 1560, 6 L.Ed.2d at 915.
[Fidelity, 458 U.S. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 675.]
Accord, Leary v. United States, 395 U.S. 6, 23-24, 89 S.Ct. 1532, 1541-42, 23 L.Ed.2d 57, 74 (1969); Brown & Williamson Tobacco Corp. v. Food and Drug Admin., 153 F.3d 155, 161 (4th Cir.1998), aff'd, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); Ayers v. Philadelphia Hous. Auth., 908 F.2d 1184, 1189 (3d Cir.1990), cert. denied, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991); Natural Res. Def. Council v. U.S. E.P.A., 822 F.2d 104, 111-12 (D.C.Cir. 1987). See also Turner, 162 N.J. at 88, 740 A. 2d 1081 (as long as federal agency intended to preempt state law, and acted within scope of delegated authority, federal regulations have same preemptive effect as federal statutes).

Preemption and Plaintiff's State Claims Relevant Statutory and Regulatory Language
In this case, there is no question that, through the Parity Act, Congress intended to preempt state law. The Parity Act contains an express preemption clause, which states as follows:
An alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation.
[12 U.S.C.A. § 3803(c).]
The question presented by this case is: to what extent did Congress, through the Parity Act, intend to preempt state laws? This question involves an interpretation of the scope of the Parity Act's preemption clause. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 423 (1992).
Similarly, there is no question that, in passing 12 C.F.R. § 560.220, the OTS intended to preempt state law, pursuant to the authority delegated to the agency, by Congress, under the Parity Act. That is evident from the language of 12 C.F.R. § 560.220 in which the OTS stated that non-federally chartered housing creditors could make AMTs, in accordance with this regulation, "notwithstanding any state constitution, law, or regulation."
Moreover, there is no question that 12 C.F.R. § 560.220 actually conflicts with New Jersey law. Specifically, New Jersey's Prepayment Law expressly prohibits prepayment penalties on residential mortgages. N.J.S.A. 46:10B-2. However, in 12 C.F.R. § 560.220, the OTS determined that state-chartered housing creditors, like their federal counterparts, are authorized to charge prepayment penalties on AMTs. Specifically, in 12 C.F.R. § 560.220, the OTS determined that 12 C.F.R. § 560.34 should be applied to AMTs issued by state-chartered housing creditors, under the Parity Act. 12 C.F.R. § 560.34 provides that "[s]ubject to the terms of the loan contract, a Federal savings and loan association may impose a fee for any prepayment of a loan."
Thus, in the present case, the heart of the preemption issue is whether 12 C.F.R. § 560.220 constitutes a valid exercise of the OTS's regulatory authority. In other words, in implementing 12 C.F.R. § 560.220, in 1996, did the OTS exceed the bounds of authority, delegated to it by Congress, under the Parity Act? Turner, *502 162 N.J. at 88, 740 A.2d 1081. See also, Thomas v. North Carolina Dept. of Human Res., 124 N.C.App. 698, 478 S.E.2d 816, 823-24 (1996) (under federal system, states possess sovereignty concurrent with that of federal government, subject only to limitations imposed by Supremacy Clause; therefore, state court had jurisdiction to interpret federal statute and invalidate federal regulation which conflicted with it), aff'd, 346 N.C. 268, 485 S.E.2d 295 (1997).

Applicable Law
There are three cases addressing the scope of the Parity Act's preemption clause, in the context of state statutes limiting prepayment penalties. They are: (1) Shinn, 96 F.Supp.2d 419; (2) Face, 239 F.3d 633; and (3) Benay v. Ameriquest Mortgage Co., No. 00-2173 (D.N.J. June 29, 2001). Benay is an unpublished decision, and thus has no precedential value. R. 1:36-3. We mention Benay for historical purposes and the sake of completeness, not as precedent. Both parties discussed Benay in their briefs. Falcon v. American Cyanamid, 221 N.J.Super. 252, 261 n. 2, 534 A.2d 403 (App.Div.1987).
Also relevant are a Notice of Proposed Rulemaking, published by the OTS on April 25, 2002, Alternative Mortgage Transaction Act Parity Act; Preemption, 67 Fed.Reg. 20,468 (Apr. 25, 2002), and a Final Rulemaking, published by the OTS on September 26, 2002, Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. 60,542 (Sept. 26, 2002).

Shinn, 96 F.Supp.2d 419 (D.N.J.2000)
In Shinn, the plaintiffs were charged a prepayment fee of $4,838.80 when they refinanced their mortgage, which constituted an AMT under the Parity Act. Id. at 420, 425-26. They filed suit, alleging that the prepayment fee violated New Jersey's Prepayment Law and Consumer Fraud Act, and the Federal Truth in Lending Act. Id. at 420. After removing the case to federal court, the defendants moved to dismiss the state law claims, on the grounds that they were preempted by the Parity Act. Ibid.
The court held that the plaintiffs' claim under New Jersey's Prepayment Law was preempted by 12 C.F.R. § 560.220, which expressly permits state-chartered housing creditors, like their federal counterparts, to charge prepayment fees on AMTs covered by the Parity Act. Id. at 422-26. In reaching this conclusion, the court first determined that, in passing 12 C.F.R. § 560.220, the OTS "clearly expressed its intent to preempt state laws which limit state creditors' ability to charge prepayment penalties in connection with AMTs." Id. at 423. For this proposition, the court also relied upon an opinion letter issued by the OTS in 1996 (OTS 1996 Opinion Letter ). In the OTS 1996 Opinion Letter, the OTS expressed that the Parity Act preempted a Wisconsin statute which, depending upon the circumstances, limited or flatly prohibited prepayment penalties. The OTS concluded that a contrary interpretation "would undermine the purposes of the Parity Act[,] as state housing creditors `would be clearly disadvantaged vis-a-vis federal thriftsthe very result Congress intended to prevent.'" Ibid. (quoting Effect of Parity Act on Wisconsin Prepayment Penalty Statute, 1996 OTS LEXIS 19, *7).
Next, the Shinn court considered whether 12 C.F.R. § 560.220 constituted a valid exercise of the OTS's delegated authority under the Parity Act. As to this issue, the court concluded that, under the Parity Act, 12 U.S.C.A. § 3803(a)(3), Congress delegated to the Director of the OTS broad authority to regulate state-chartered housing creditors which engaged in AMTs, co-extensive with the OTS's authority to regulate comparable, federally-chartered *503 housing creditors. Id. at 424. The court thus held that the OTS had the requisite authority to issue the regulation in issue, 12 C.F.R. § 560.220, as well as the OTS 1996 Opinion Letter. Id. at 423-24.
The court rejected the plaintiffs' argument that the OTS's authority to issue regulations under the Parity Act, applicable to AMTs issued by state-chartered housing creditors, was limited to a sixty-day period immediately following passage of the Parity Act. The court found no support for that argument in the statutory language of the Parity Act, or in logic. Id. at 424-25. The court further rejected the plaintiffs' argument that, by passing 12 C.F.R. § 560.220 in 1996, after the Parity Act's opt-out period had ended, under 12 U.S.C.A. § 3804, New Jersey had been "sandbagged" into accepting the Parity Act, without understanding its true effects. Id. at 424-25. The court concluded that, in agreeing to the Parity Act's preemption provision, New Jersey accepted and understood that, not only would state-chartered housing creditors be governed by the OTS's regulations applicable to AMTs, but also that the OTS would have the power to issue regulations to the extent authorized by its rulemaking authority. Id. at 425.
Finally, the court rejected the plaintiffs' contention that 12 C.F.R. § 560.220 constituted an unreasonable application or interpretation of the Parity Act's preemption provision, stating:
Contrary to plaintiffs' characterization of the [Parity] Act, the Court finds that [12 U.S.C.A.] § 3803(c) does not limit the preemptive effect of the [Parity] Act to state laws which would completely prohibit or obstruct the creation of AMTs. Section 3803(c) states only that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." The language of this section does not support plaintiffs' narrow interpretation of [the Parity Act's] preemptive effect. Nor does the Court agree that the sole purpose of the [Parity] Act is to enable state lenders to engage in AMTs. A paramount purpose of the [Parity] Act is [to] create parity between state and federal lenders who engage in AMTs. The Court finds that the [OTS 1996 Opinion Letter] and the OTS's regulations governing prepayment penalties [12 C.F.R. § 560.220] are, to the extent they preempt state law, a permissible interpretation of the congressional authority vested in the OTS under the Parity Act.
[Id. at 425.]

Face, 239 F.3d 633 (4th Cir.2001)
In Face, the National Home Equity Mortgage Association filed a declaratory judgment suit, seeking to prohibit Virginia officials, with respect to AMTs made under the Parity Act, from enforcing a state statute which limited prepayment penalties. Face, 239 F.3d at 635-36, 638. The court held that the Virginia statute was preempted by 12 C.F.R. § 560.220, adopted by the OTS pursuant to authority delegated to it under the Parity Act, which expressly permits both federally and non-federally chartered housing creditors to charge prepayment penalties on AMTs, subject only to the terms of the mortgage contract. Id. at 638-40.

Benay, No. 00-2173 (D.N.J. June 29, 2001)
In Benay, the plaintiffs engaged in an adjustable rate mortgage (an AMT) with defendant. When they sold the mortgaged property, they were charged a prepayment penalty of $11,045.36 on a principal balance of $249,194.24. Plaintiffs sued, alleging that the prepayment penalty violated New *504 Jersey's Prepayment Law. Relying upon Shinn, 96 F.Supp.2d 419, and Face, 239 F.3d 633, the court held that the Prepayment Law claim was preempted by 12 C.F.R. § 560.220, under which defendant was authorized to charge the prepayment penalty.
The court also considered the "reasonableness" of the amount of the prepayment fee. The court found that there was no reasonableness limitation on prepayment penalties, under either federal or state law. Rather, New Jersey courts would only void contract provisions they found to be "unconscionable." As to this issue, the court held that the prepayment penalty at issue was "neither unconscionable nor made to mislead the Plaintiffs."[1]

OTS's April 25, 2002 Notice of Proposed Rulemaking
After Shinn, Face, and Benay were decided, the OTS published a Notice of Proposed Rulemaking which casts strong doubt on the correctness of the holdings in those cases. Specifically, on April 25, 2002, the OTS issued a Notice of Proposed Rulemaking in which it proposed that the "OTS would no longer identify its regulations on prepayment ... charges" as applicable to state housing creditors under the Parity Act. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. 20,468 (Apr. 25, 2002) (Proposed Rulemaking). In other words, under the OTS's Proposed Rulemaking, 12 C.F.R. § 560.220 will no longer incorporate 12 C.F.R. § 560.34. Therefore, the OTS will no longer authorize state-chartered housing creditors, like their federal counterparts, to charge prepayment penalties on AMTs made under the Parity Act. Ibid.
Of significant importance to this case are the OTS's stated reasons for its Proposed Rulemaking. First, in the Proposed Rulemaking, the OTS repudiated its 1996 decision to incorporate 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220, and thus to regulate prepayment penalties on AMTs issued by state-chartered housing creditors under the Parity Act. The OTS also repudiated the OTS 1996 Opinion Letter, in which the OTS expressed that Wisconsin's statutory restrictions on prepayment fees were preempted by the Parity Act. The OTS stated that, in its opinion, both decisions were not well-reasoned. Indeed, the OTS admitted that its decision, in 1996, to incorporate 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220, was not supported by any reasoning at all. 67 Fed.Reg. at 20,469-70, n. 17. In so stating, the OTS tacitly admitted that 12 C.F.R. § 560.220, to the extent it incorporates 12 C.F.R. § 560.34, is arbitrary and capricious, and unlawful. If the OTS is correct on this point, then plaintiff's claims, challenging the prepayment fee under state laws which prohibit prepayment penalties, are not preempted by 12 C.F.R. § 560.220, because it is an invalid regulation. Fidelity, 458 U.S. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 675.
Second, in the Notice of Proposed Rulemaking, the OTS suggested the agency's *505 current belief that its decision, in 1996, to incorporate 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220, and thus to regulate prepayment penalties on AMTs issued by state-chartered housing creditors under the Parity Act, exceeded the scope of authority delegated to the OTS, by Congress, under the Parity Act. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. at 20,469-70. Specifically, the OTS states that, in its current opinion:
prepayment ... fee provisions are not intrinsic to the ability to offer alternative mortgages.
[Id. at 24,670.]
While the OTS recognized that state housing creditors might view its Proposed Rulemaking as having a discriminatory impact on their ability to offer alternative mortgages, the OTS noted that:
States that restrict prepayment penalties... generally apply those restrictions to all real estate loans, not just to alternative mortgage transactions. The states' laws in these areas are not directed at restricting alternative mortgage transactions but in regulating mortgage transactions in general.

[Ibid.]
Moreover, the OTS examined the intent of the Parity Act, and the scope of the Parity Act's preemption clause, stating as follows:
One of the congressional findings underlying the Parity Act was that OTS and the other federal regulators had adopted regulations authorizing their federally chartered institutions to offer alternative mortgages, and that the purpose of the Act was to eliminate the discriminatory impact of those regulations. [The] OTS regulation[] on prepayment penalties [12 C.F.R. § 560.34] ... however, [was] not adopted to enable federal thrifts to engage in alternative mortgage financing, but rather to permit federal thrifts the flexibility to exercise their lending powers under a uniform federal scheme. See 12 C.F.R. 560.2(a). Therefore, OTS does not believe that Congress intended that regulations such as [12 C.F.R. § 560.34] would offer a basis for claiming discriminatory treatment or were needed to provide parity with federally-chartered institutions. Indeed, OTS broadly allows federal thrifts to impose loan-related fees (e.g., initial charges and servicing fees) on any loan including alternative mortgages, notwithstanding any state law to the contrary. OTS also allows federal thrifts to process and originate any loan including alternative mortgages, without regard to state law. There is no basis for distinguishing prepayment penalties ... from these other OTS rules that apply generally to loans.
[Ibid. (footnotes omitted) (emphasis added).]
These statements reflect at least a tacit admission by the OTS that, to the extent 12 C.F.R. § 560.220 incorporates 12 C.F.R. § 560.34, and thus regulates prepayment penalties on AMTs issued by state-chartered housing creditors under the Parity Act, it is not "an accommodation Congress would have sanctioned" as an appropriate exercise of the Parity Act's preemption clause, because it is not necessary to effectuate Congress's goals in passing the Parity Act. Fidelity, 458 U.S. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 675. If the OTS is correct on this point, then plaintiff's state law claims, challenging the prepayment fee, are not preempted by 12 C.F.R. § 560.220, which is an invalid regulation. Ibid.
Thus, both of the OTS's stated reasons for its Proposed Rulemaking question the very foundation upon which the holdings of Shinn, Face, and Benay, are basedthe legality of 12 C.F.R. § 560.220, the OTS's decision, in 1996, to regulate state-chartered housing creditors' assessment of prepayment *506 penalties on AMTs made under the Parity Act. In our opinion, the OTS's Notice of Proposed Rulemaking requires that the holdings of Shinn, Face, and Benay be subjected to greater scrutiny, based upon the arguments put forth by the OTS. We disagree with defendant's contention that the Proposed Rulemaking does not constitute an acknowledgment by the OTS that 12 C.F.R. § 560.220 is ultra vires. That contention is unsupported by the language used in the Proposed Rulemaking.

OTS's September 26, 2002, Final Rulemaking
On September 26, 2002 the OTS adopted the Proposed Rulemaking as final, and explicitly adopted the findings and conclusions it had made in the Proposed Rulemaking. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. 60,542, 60,544 (Sept. 26, 2002) (Final Rulemaking).
The OTS also criticized Congress for not giving the applicable federal agencies sufficient guidance in how to exercise their delegated regulatory authority under the Parity Act. In the OTS's opinion, this lack of clarity has resulted in inconsistencies in approach, both between the three federal agencies and within the OTS. More specifically, the OTS noted that, originally, the FHLBB took a narrow view of its regulatory authority under the Parity Act; only in 1996 did the OTS take the expanded view with which the agency now disagrees. Id. at 60,543-45.
In the OTS's present opinion, the agency may not regulate those aspects of AMTs which are applicable to real estate lending in generalsuch as prepayment fees which the OTS does not believe are essential for parity. The OTS reasoned that, in passing the Parity Act, Congress did not intend to place state housing creditors under the supervision of federal agencies; indeed, Congress left room for state action by specifically reserving specific areas to the states. Moreover, had Congress intended to regulate prepayment penalties, it is unlikely Congress would have adopted the statutory scheme found in the Parity Actallowing three different federal agencies to promulgate regulations, each of which, at the time the Parity Act was passed, took a different approach to prepayment penalties. Id. at 60,543-48.
Nevertheless, the OTS concluded that the various approaches taken between and among the three federal agencies demonstrated that the scope of the Parity Act's preemption was "susceptible to a number of interpretations." Id. at 60,544. While the OTS now disagreed with the approach taken in 1996, the OTS did not believe the approach taken in 1996 represented an "impermissible construction" of the Parity Act. Rather it represented a choice between "two permissible interpretations" of the Parity Act. Id. at 60,550. Therefore, the OTS did not believe its present position was inconsistent with the decisions in Face and Shinn. Id. at 60,546-47, n. 26.
Finally, the OTS stated that it would not apply its Final Rulemaking retroactively, to loans consummated before the effective date. Id. at 60,550. It recognized that to do so "would seriously disrupt the mortgage markets," and the OTS did not believe that it could take away or impair vested rights acquired under a lawfully issued and effective regulation. Ibid.
On December 12, 2002 the OTS delayed the effective date of its final rule, published on September 26, 2002, Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. 60,5421 (Sep. 26, 2002). The effective date of the new rule has been extended for six months, to July 1, 2003, in order to permit state-chartered housing creditors additional time to determine *507 applicable legal requirements under state law, reprogram systems and rewrite documents, and conduct training of their employees and agents. Alternative Mortgage Transaction Parity Act; Preemption Delay of Effective Date, 67 Fed.Reg. 76,304 (Dec. 12, 2002). Therefore, 12 C.F.R. § 560.220, the validity of which is at issue in the present Glukowsky litigation, will remain in effect through July 1, 2003. The OTS's decision to defer implementation of its new rule points to the difficulties housing creditors face in complying with regulations on a state-by-state basis.

Decision on Preemption Issue
We believe that Congress's intent in passing the Parity Act was narrow and the scope of its preemption clause is also narrow. In our opinion, in passing the Parity Act, Congress neither intended to nor authorized the OTS to issue 12 C.F.R. § 560.22, to the extent that regulation purports to preempt state laws which limit or prohibit the assessment of prepayment penalties on AMTs.
We agree with the reasoning set forth in the OTS's Notice of Proposed Rulemaking. In accordance with that reasoning, we find that 12 C.F.R. § 560.220 is invalid to the extent it incorporates 12 C.F.R. § 560.34, thereby regulating prepayment penalties assessed by state-chartered housing creditors on AMTs covered by the Parity Act. Furthermore, as will be discussed, in our opinion, Shinn, Face, and Benay, as well as the OTS 1996 Opinion Letter, were incorrectly decided because they did not give proper consideration to: (1) Congress's limited purpose in passing the Parity Act, to create a national market for AMTs; or (2) Congress's limited intent, through the Parity Act's preemption provision, to preempt only those state laws which prohibit or interfere with a housing creditor's ability to make, purchase, or enforce AMTs.
We hold that, to the extent 12 C.F.R. § 560.220 incorporates the regulation of prepayment penalties under 12 C.F.R. § 560.34, and applies 12 C.F.R. § 560.34 to AMTs issued by state-chartered housing creditors, it is unlawful, because it exceeds the scope of authority Congress delegated to the OTS under the Parity Act.

Congress Had a Limited Purpose in Passing the Parity Act
Congress's stated purpose in passing the Parity Act was to provide non-federally chartered housing creditors parity with federally chartered housing creditors "by authorizing" non-federally chartered housing creditors to make, purchase, and enforce AMTs. 12 U.S.C.A. § 3801(b) (emphasis added). Nothing in the Parity Act indicates that it was directed at anything other than achieving the limited purpose of creating a national market for AMTs, making AMTs available throughout the United States.
The purpose of the Parity Act could not have been, as defendant argues, and as the federal courts suggested in Shinn, Face, and Benay, to create complete parity between federally and non-federally chartered housing creditors, so that every AMT, throughout the nation, must contain, or at least offer, the same terms, down to the minutiae of regulating the fees and penalties which may be imposed. This would involve a much broader purpose by Congress expressed in the Parity Act. It would involve a purpose to regulate the national market for AMTs which Congress created through the Parity Actwholly supplanting state regulation of mortgage transactions, at least with respect to AMTs, and replacing it with a pervasive, uniform scheme of federal regulations applicable to AMTs.
If this were Congress's intent in passing the Parity Act, we would have expected *508 Congress to so state. Nothing in the Parity Act indicates such a broad purpose. Moreover, if this were Congress's intent, to effectuate such a broad purpose would require significantly more federal regulation of AMTs than currently exists. In this regard, we observe that the OTS currently has only two regulations relating to alternative mortgage transactions: 12 C.F.R. § 560.210 and 12 C.F.R. § 560.220.
Indeed, the California Court of Appeals recently noted the "dearth" of federal regulations governing AMTs, in rejecting a broad interpretation of the Parity Act's purpose. Specifically, the California court stated:
Respondents argue that ... the purpose of the Parity Act is the achievement of absolute parity with federally chartered lending institutions....
We are not persuaded by respondents' expansive view of Congress's purpose in enacting the Parity Act. Of course, absolute parity would achieve the results that Congress sought, but so would much less, such as simply authorizing non-federally chartered housing creditors to engage in alternative mortgage financing. The statute as a whole, in particular the permission retained by the states to regulate housing creditors (see 12 U.S.C. § 3802(2)), counsels against respondents' generous interpretation of congressional purpose, an interpretation that would permit non-federally chartered housing creditors to present information to borrowers in a misleading, distorted or even inaccurate fashion with impunity because of the lack of federal regulation.
For similar reasons, respondents' contention that the goal of the Parity Act is national uniformity in the regulation of state-chartered housing lenders with respect to alternative mortgage transactions is also flawed. Given the dearth of applicable federal regulations, the national uniform standard for state-chartered housing lenders would be "anything goes." That is hardly a uniform standard.

[Black, 112 Cal.Rptr.2d at 457 (emphasis added).]
To recognize federal regulations as the exclusive regulation of AMTs would create an intolerable situation, whereby housing creditors could attempt to structure their mortgage loans to make them AMTs, thereby avoiding state consumer protection laws, applicable to all mortgage transactions, in favor of the "no holds barred" federal scheme applicable to AMTs. The OTS noted this effect in its Proposed Rulemaking, remarking that consumer groups and States had complained that "state housing creditors are taking advantage of OTS regulations on prepayment penalties... by structuring otherwise fixed-rate, fixed term loans with features to make them alternative mortgages and thus avoid state restrictions on these charges," thereby piggybacking on federal preemption to facilitate predatory practices. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. at 20,469.
Finally, supporting a finding that the Parity Act has a limited purpose to create a national market for AMTs, and not a broad purpose to regulate the terms of all AMTs issued throughout the nation, is the fact that the Parity Act makes no mention at all of the specific terms which must be available for AMTs, and makes no mention whatsoever of fees or charges which must be allowed for AMTs. The OTS noted the significance of this fact in its Proposed Rulemaking stating specifically: "It is of note that the Parity Act makes no reference to fees or penalties nor does it direct the federal regulators to consider their impact on alternative mortgages." Id. at 20,470, n. 19.
Indeed, one could read the Parity Act as anticipating that there would be diversity *509 in the terms offered by AMTs because the Parity Act: (1) expressly grants states the authority to opt out of the federal scheme, 12 U.S.C.A. § 3804(a); and (2) provides that three different federal agencies have regulatory authority in this area of law, depending upon the nature of the entity being regulated (bank, credit union, or "all other housing creditors"). 12 U.S.C.A. § 3803(a).[2] This is something the OTS noted in its Final Rulemaking. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. at 60,545-46.
Given Congress's limited purpose in enacting the Parity Act to create a national market for AMTs, we cannot conclude that 12 C.F.R. § 560.220 may be viewed as a valid exercise of the authority delegated to the OTS by Congress, under the Parity Actat least to the extent 12 C.F.R. § 560.220 purports to regulate state-chartered housing creditors' assessment of prepayment penalties on AMTs covered by the Parity Act, by incorporating 12 C.F.R. § 560.34. Section 12 C.F.R. § 560.220's incorporation and application of 12 C.F.R. § 560.34 to state-chartered housing creditors goes well beyond the intent of Congress to create a national market for AMTs. It reflects a purpose not intended by Congress, to regulate the market for AMTs created by the Parity Act. We find it invalid.

The Parity Act's Preemption Clause Reflects Congress's Limited Purpose, To Preempt Only Those State Laws Which Prohibit or Interfere with a Housing Creditor's Ability to Make, Purchase, or Enforce AMTs
The Parity Act's preemption clause also reflects Congress's intent to preempt state law in only a limited way. It provides that: "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." 12 U.S.C.A. § 3803(c). In our opinion, this language reflects a limited intent by Congress, to preempt only those state laws which prohibit or interfere with a housing creditor's ability to "make, purchase, [or] enforce" AMTs. 28 U.S.C.A. § 3801. Significantly, this is also the interpretation by the Office of the Attorney General for the State of New Jersey.
Specifically, in a March 6, 1987 Opinion Letter to the Commissioner of the New Jersey Department of Banking, Deputy Attorney General Barbara S. Goldsmith expressed that the Parity Act was not meant to occupy the field of regulating AMTS. Rather, "Congress intended to countenance state involvement in this area." Thus, Goldsmith concluded that the "the Parity Act preempts only those provisions of State law which disallow the making, purchase or enforcement of alternative mortgage transactions or which conflict with the regulations ... deemed to be applicable to housing creditors," assuming, of course that those regulations are valid.
The California Court of Appeals has also adopted this interpretation. Specifically, in Black, 112 Cal.Rptr.2d at 455, the California Court of Appeals considered the Parity Act's preemption clause, in a different context than the present case, and concluded that the language was
susceptible to at least two interpretations. On one hand, the phrase "state *510 constitution, law, or regulation" is modified with the adjective "any," supporting the argument that the preemption provision precludes all state regulations of alternative mortgage transactions involving state-chartered housing creditors.
On the other hand, the phrase "any state constitution, law, or regulation" can be interpreted as implicitly limited to those that prohibit or impede alternative mortgage transactions or that conflict with federal regulations deemed applicable to non-federally chartered housing creditors, i.e., the regulations that the transaction must be made "in accordance with."
[Id. at 455.]
That court went on to recognize that other provisions of the Parity Act supported the latter, narrower interpretation of the preemption clause. Therefore, the court adopted this narrower interpretation. Id. at 455-58.
Through the Parity Act, Congress clearly granted OTS regulatory authority to preempt state law, 12 U.S.C.A. § 3801(a)(3) and 3803(a). However, that regulatory authority must be viewed as limited by Congress's limited preemptive intent, as expressed in the Parity Act's preemption clause, 12 U.S.C.A. § 3803(c), to preempt only those state laws which prohibit or interfere with a housing creditor's ability to "make, purchase, [or] enforce" AMTs, 12 U.S.C.A. § 3801.
Under this limited view of the Parity Act's preemption clause, it is clear to us that 12 C.F.R. § 560.220 goes well beyond Congress's preemptive intent, to the extent it incorporates 12 C.F.R. § 560.34, because prepayment penalties do not prohibit or interfere with a housing creditor's ability to make, purchase, or enforce AMTs. Indeed, prepayment fees are not unique to AMTs. They are common to traditional mortgages, as well as other consumer loans. Thus, prepayment fees cannot be viewed as limiting the availability of AMTs, any more than they may be viewed as limiting the availability of traditional mortgages or other forms of consumer financing.
The OTS recognized this fact in both its recent Proposed Rulemaking and Final Rulemaking. Specifically, the OTS remarked that: (1) state prohibitions against or limitations of prepayment fees are not directed at prohibiting or limiting the availability of AMTs; and (2) the OTS regulation, authorizing prepayment penalties, 12 C.F.R. § 560.34, was not adopted by the OTS in order to enable federally chartered housing creditors to engage in AMTs. Thus, there is no legitimate reason to apply 12 C.F.R. § 560.34 to state-chartered housing creditors, with respect to AMTs covered by the Parity Act, as the OTS did in 1996, by incorporating 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220. Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. at 20,470; Alternative Mortgage Transaction Parity Act; Preemption, 67 Fed.Reg. at 60,544-46.
Indeed, it is extremely significant that the OTS's 1996 incorporation of 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220, and thus its decision to regulate prepayment fees with respect to state-chartered housing creditors' AMTs, represented a significant change in policy, and a significant expansion of the OTS's jurisdiction. As plaintiff's brief points out, contrary to the OTS's 1996 position, in 1983, the FHLBB took a much more limited view of its role in regulating state-chartered housing creditors' AMTs, under the Parity Act. Specifically, the FHLBB took the position that, under the Parity Act, it should apply to state-chartered housing creditors, only "those regulatory provisions that describe *511 and define alternative mortgage transactions," and not "those provisions that apply generally to mortgage loans " such as prepayment penalties. Implementation of New Powers; Limitation on Loans to One Borrower, 48 Fed.Reg. 23032, 23058 (May 23, 1983) (emphasis added). The FHLBB's more limited approach was "premised on the clear statement of Congressional intent that [the Parity Act] `does not place non-federally chartered housing creditors under the supervision of the federal agencies, but instead merely enables them to follow a federal program as an alternative to state law.'" Ibid. (quoting S.Rep. No. 97-463, 97th Cong., 2d Sess. 55).
Thus, because it conflicts with the OTS's prior interpretation, the OTS's decision in 1996 to regulate prepayment fees with respect to AMTs by incorporating 12 C.F.R. § 560.34 into 12 C.F.R. § 560.220 is "`entitled to considerably less deference'" from this court. Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417, 113 S.Ct. 2151, 2161, 124 L. Ed.2d 368, 383 (1993) (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80, 92 (1981)). See also, Brown & Williamson, 153 F.3d at 162 (closer scrutiny suggested where an agency is attempting to expand the scope of its jurisdiction).
Finally, defendant's reliance upon Turner, 162 N.J. 75, 740 A.2d 1081, as to the broad scope of the OTS's delegated authority, is inapposite, and somewhat misleading. In Turner, our Supreme Court recognized that, under the HOLA, Congress granted the OTS broad authority to regulate federal savings and loan associations, and the OTS occupied the field of lending regulation for federal savings and loan associations. Therefore, there was no room for state regulation of federal savings and loan associations. Id. at 88-94, 740 A.2d 1081. That is not the question posed in the present case. Here, the question is the scope of authority delegated to the OTS, under the Parity Act, to regulate AMTs issued by state-chartered housing creditors.

V
Turning to the question of whether the complaint states a claim upon which relief may be granted, in reviewing a complaint dismissed under R. 4:6-2(e) our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint. We must not concern ourselves with the plaintiff's ability to prove those allegations. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). The complaint should be searched "`in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'" Ibid. (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J.Super. 244, 252, 128 A.2d 281 (App.Div.1957)). Our analysis must be "at once painstaking and undertaken with a generous and hospitable approach," with every reasonable inference of fact granted to the plaintiff, and with the recognition that such motions should be approached with caution, and granted only in the rarest of instances. Printing Mart-Morristown, 116 N.J. at 746, 771-72, 563 A.2d 31. Accord, R. 4:5-7 Spring Motors Distribs., Inc. v. Ford Motor Co., 191 N.J.Super. 22, 29-30, 465 A.2d 530 (App.Div.1983), aff'd in part and rev'd in part on other grounds, 98 N.J. 555, 489 A.2d 660 (1985). Cf., R. 4:5-2 (complaint must contain statement of facts upon which claims are based, showing pleader is entitled to relief sought).

Whether the Complaint Stated a Claim for Violation of The Prepayment Law
Presuming plaintiff's allegations to be true, defendant's collection of a prepayment *512 fee for the prepayment in full of the mortgage violates the Prepayment Law. N.J.S.A. 46:10B-2. Defendant contends that N.J.S.A. 46:10B-2 does not prohibit prepayment fees despite its clear language to that effect. Defendant contends that, read together, N.J.S.A. 46:10B-2 and N.J.S.A. 46:10B-3 must be interpreted as permitting residential mortgage lenders to charge a prepayment fee, if the mortgage is prepaid, in full, during the first eighteen months of the mortgage. We find no support for this argument in the statutory language.
N.J.S.A. 46:10B-2[3] and N.J.S.A. 46:10B-3[4] address two entirely different scenarios. N.J.S.A. 46:10B-2 addresses the entire prepayment of a residential mortgage, and expressly prohibits the collection of a prepayment fee under those circumstances. N.J.S.A. 46:10B-2 in no way limits its prohibition of prepayment fees to the period eighteen months or more after the mortgage is executed. Indeed, N.J.S.A. 46:10B-2 explicitly states that a mortgage may be prepaid, in full, without penalty, "at any time." Thus, N.J.S.A. 46:10B-2 is directly applicable to the facts of this case, and directly prohibits the conduct in which defendant allegedly engaged.
N.J.S.A. 46:10B-3 addresses the partial prepayment of a mortgage loan. It provides that, under limited circumstances, mortgage borrowers may make partial prepayments of a mortgage, without being assessed a prepayment penalty. N.J.S.A. 46:10B-3 is not implicated in this case, which does not involve the partial prepayment of a mortgage. We see nothing in N.J.S.A. 46:10B-3 which limits its applicability to the first eighteen months of a mortgage loan, as defendant contends. Rather, the appropriate interpretation of N.J.S.A. 46:10B-3 is that it applies during any six-month period over the life of a mortgage loan.
The Legislature's reasons for distinguishing between full and partial prepayment of a mortgage are irrelevant here. But we note that there may be legitimate reasons for treating the situations differently. For example, total prepayment of a mortgage typically occurs when the mortgaged property has been sold or the mortgage has been refinanced. The Legislature may have wished to protect residential mortgage borrowers from prepayment charges under those circumstances.
Partial prepayment of a mortgage, over multiple payment periods, however, imposes transaction costs upon the mortgage lender. N.J.S.A. 46:10B-3 appears to be a recognition of that fact, and an attempt to resolve the conflicting interests of borrower and lender, by limiting the circumstances under which borrowers may make partial prepayments without incurring a fee. Viewed in this light, N.J.S.A. 46:10B-3 simultaneously limits to an extent the transaction costs imposed on mortgage *513 lenders, while protecting the rights of mortgage borrowers to make partial prepayments.
We reject defendant's interpretation of N.J.S.A. 46:10B-2 and N.J.S.A. 46:10B-3 and hold that they do not permit the collection of a prepayment fee, if a mortgage is prepaid, in full, during the first eighteen months of the loan.
We hold that Count One of the complaint states a valid claim under New Jersey's Prepayment Law, N.J.S.A. 46:10B-2, which is not preempted by federal law.

VI
Under its express terms, the Market Rate Consumer Loan Act, N.J.S.A. 17:3B-4 to -27, does not apply to defendant. Defendant does not fit within the statutory definition of a "lender," since defendant is not a bank, a federally chartered savings bank, or an association. Rather, the record shows that defendant is licensed by the State of New Jersey as, among other things, a "mortgage banker" under the New Jersey Licensed Lenders Act. N.J.S.A. 17:11C-1 to -49. Defendant has submitted copies of its licenses to substantiate this fact. Plaintiff's argument is without merit. The complaint fails to state a claim upon which relief may be granted under the Market Rate Act. We affirm the dismissal of Count Two of the complaint.

VII
Plaintiff also alleges that defendant violated the Licensed Lenders Act, N.J.S.A. 17:11C-23, and one of the regulations adopted under the Licensed Lenders Act, N.J.A.C. 3:15-10.1(b). We could reject this claim because plaintiff neither pleaded it in the complaint nor moved to amend the complaint to state such a claim. Brown v. Tp. of Old Bridge, 319 N.J.Super. 476, 501, 725 A.2d 1154 (App.Div.), certif. denied, 162 N.J. 131, 741 A.2d 99 (1999); Skripek v. Bergamo, 200 N.J.Super. 620, 629, 491 A.2d 1336 (App.Div.), certif. denied, 102 N.J. 303, 508 A.2d 189 (1985). We choose to address the argument because there is a potentially valid claim under N.J.A.C. 3:15-10.1(b).
Plaintiff is incorrect in claiming that N.J.S.A. 17:11C-23 prohibits the collection of prepayment fees. N.J.S.A. 17:11C-23 limits the fees licensed lenders may charge "incidental to the origination, processing and closing of a mortgage loan transaction." This section has nothing to say with respect to prepayment fees. The applicable section of the New Jersey Administrative Code, N.J.A.C. 3:1-16.2(c), however, states that it "does not restrict the imposition of fees after the closing of a mortgage loan" (emphasis added)an example of which would be a prepayment fee.
N.J.A.C. 3:15-10.1, however, does prohibit entities licensed under the Licensed Lenders Act from charging prepayment fees. It specifically provides that "[a] borrower may repay a first mortgage loan, second mortgage loan or consumer loan at any time without penalty."
The claim asserted under N.J.S.A. 17:11C-23 is rejected as without merit but on remand, within 60 days of the date of this decision, plaintiff is permitted to amend the complaint, to assert a claim under N.J.A.C. 3:15-10.1. The claim is not preempted by federal law but, of course, may be subject to other valid defenses or challenges.

VIII
We decline to address the Consumer Fraud Claim, which was not ruled upon by the trial court. We also decline to address several of plaintiff's claims which were not pleaded in the complaint: (1) the claim that the prepayment clause is unconscionable *514 and unenforceable under general principles of contract law because the prepayment fee is unconscionable in amount; and (2) the claim that the collection of a prepayment fee violates the federal "due-on-sale" regulation, 12 C.F.R. § 591.5(b)(2)(i). In view of the need for a remand, plaintiff may amend his complaint to assert these claims within 60 days of the date of this decision.

IX
We reverse in part and affirm in part. We hold that: (1) plaintiff's state law claims are not preempted by 12 C.F.R. § 560.220 because this regulation exceeds the scope of authority Congress delegated to the OTS under the Parity Act; (2) we remand for further proceedings on plaintiff's claims under the Prepayment Law and the Consumer Fraud Act; and (3) we affirm dismissal of plaintiff's claim under the Market Rate Consumer Loan Act because defendant is not an entity covered by this statute. On the remand the plaintiff may amend his complaint to articulate claims under (1) the federal "due-on-sale" regulation, 12 C.F.R. § 591.5(b)(2)(i); (2) a state regulation adopted under the Licensed Lenders Act, N.J.A.C. 3:15-10.1; and (3) general contract principles, prohibiting unconscionable contract terms. We, of course, indicate no view on the merits of these claims.

X
Finally, the parties did not brief the issue of whether this court's decision, if a reversal, should apply retroactively or prospectively.
In determining retroactive application of a new rule, four judicial options are available: (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review [pipeline retroactivity]; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted.
[State v. Yanovsky, 340 N.J.Super. 1, 8, 773 A.2d 711 (App.Div.2001), quoting State v. Burstein, 85 N.J. 394, 402-03, 427 A.2d 525 (1981).]
"The determination of retroactive application is generally guided by three factors: `(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice.' " Id. at 9, 773 A.2d 711 (quoting State v. Knight, 145 N.J. 233, 251, 678 A.2d 642 (1996) (citation and internal quotations omitted)). See also, Alderiso v. Medical Center, 167 N.J. 191, 770 A.2d 275 (2001); SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579, 596, 767 A.2d 469 (2001).
The issue of retroactivity raises questions which have not been addressed by the parties. We leave this issue to the Law Division judge, in the first instance.
Affirmed in part; reversed in part, and remanded.
NOTES
[1] On October 21, 2002 the Seventh Circuit Court of Appeals issued an opinion in which it examined the breadth of federal preemption under the Alternative Mortgage Transaction Parity Act (Parity Act). Illinois Ass'n of Mortgage Brokers v. Office of Banks and Real Estate, 308 F.3d 762 (7th Cir.2002). The court took a broad view of the intent of Congress in passing the Parity Act, and a broad view of the Parity Act's preemption clause.

The Seventh Circuit did not address preemption of prepayment penalties, in particular, which is the subject matter of our case. The court declined to address which state regulations, in particular, were preempted by the Parity Act, 12 U.S.C.A. § 3803(c), and applicable OTS regulations, and left that decision to the district court, on remand. Id. at 768.
[2] As plaintiff points out and as the OTS recognized in its Proposed Rulemaking, 67 Fed.Reg. at 20469, the relevant federal agencies have taken different approaches to prepayment penalties. For example, one of the relevant federal agencies, the National Credit Union Administration, prohibits prepayment fees for national credit unions, 12 U.S.C.A. § 757(5)(A)(viii), whereas the Office of the Comptroller of the Currency, and the OTS have permitted prepayment fees for the entities they regulate. 67 Fed.Reg. at 20469.
[3] N.J.S.A. 46:10B 2 states:

Prepayment of a mortgage loan may be made by or on behalf of a mortgagor at any time without penalty.
[4] N.J.S.A. 46:10B 3 states:

A mortgagor shall have the right, during any 6 month period beginning with the date of the mortgage loan, to pay, without charge or penalty, an additional sum of $50.00, or multiples thereof, on account of the principal amount owing on a mortgage loan, provided that the additional sums so paid and the principal payments required to be made by the terms of such mortgage loan during such 6 month period do not together exceed in any such 6 month period 33-1/3% of the face amount of such mortgage loan. The right to make additional payments as provided by this section shall not be cumulative, and to the extent that it is not exercised during any 6 month period, shall lapse.